UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANICE SHORTER, | ) | CIVIL ACTION NO. 3:16-CV-1973 |
| *Personal Representative and Legal* | ) | |
| *Guardian for Donshay Sayles* | ) | (MANNION, D.J.) |
| Plaintiff | ) | |
| | ) | (ARBUCKLE, M.J.) |
| v. | ) | |
| | ) | |
| CHARLES E. SAMUELS, JR. *et al.,* | ) | |
| Defendants | ) | |

MEMORANDUM OPINION
*Plaintiff's Motion to Compel, Doc. 96*

Table of Contents

I. **Introduction**................................................................................3

II. **Background & Procedural History**..............................................3

III. **Legal Standard**.......................................................................12

IV. **Analysis**...................................................................................14

  A. **Discovery Disputes Related to Defendants' Responses to Plaintiff's November 26, 2019 Discovery Requests** ............................................14

  1. **Request For Production #1 (Green Monster log book)**...........................15

  2. **Request for Production #2 (Wing's 292 Forms)** .......................................17

  3. **Request for Production #3 (Sayles 292 Forms)**........................................19

  4. **Request for Production #6 (Rounds check sheets)** ...................................22

  5. **Request for Production #9 (May 14, 2014 Daily Log)**...............................26

**6.  Request for Production #11 (Wing "Sensitive Report" Information)**....28

**7.  Request for Production #20 (Lieutenant Meetings Course List)** ...........30

**8.  Request for Production #26 (Portions of 3 Manuals)**................................33

**9.  Requests for Production #22, 27 & 28 (Inmate violence reports)**...........48

**10. Request for Production #29 (Defendants' personnel files)** .....................70

**11. Request for Production #34 (Email search terms list)** ............................79

**B. Other Outstanding Disputes**.................................................................**82**
**1.  Additional Issue #1 (Joseph Wing's 2014 FBI Interview)** .....................83

**2.  Additional Issue #2 (Custodial Manual)**..................................................83

**3.  Additional Issue #3 (Sayles administrative remedy documents)** ...........84

**4.  Additional Issue #4 (Sayles' Request Slips)** ............................................87

**C. Pending Motion For Summary Judgment** .................................................**89**
**V. Conclusion** ..................................................................................................90

I.    **INTRODUCTION**

When a federal inmate dies or is seriously injured while in prison, the family wants answers. The family's lawyer wants evidence. The Bureau of Prisons seeks to provide answers and evidence, but also wants to protect institutional security and the policies and people it believes provide that security. Those competing "wants" collide in this discovery dispute.

The Plaintiff's Motion to Compel Discovery[1] and competing briefs[2] fill three hundred and seventy-six (376) pages, including twenty-seven (27) exhibits. The Court has held eight (8) separate telephone conferences[3] attempting to resolve these discovery issues informally. Despite good faith efforts, at the filing of the motion the parties were unable to reach agreement on seventeen (17) discrete discovery issues. Although some have since been resolved, the Court is still required to make some discovery decision for the parties.

II.    **BACKGROUND & PROCEDURAL HISTORY**

According to the Second Amended Complaint, Donshay Sayles, an African American man, was a federal prisoner at USP Big Sandy. (Doc. 23, ¶¶ 3, 32). While at USP Big Sandy, other inmates threatened Sayles for not assisting them in a melee

---

[1] Doc. 96.
[2] Docs. 98, 102, 103, 110, 117, & 118.
[3] Doc. 32, 06/13/17; Doc. 53, 02/19/19; Doc. 66, 05/07/19; Doc. 68, 06/16/19; Doc. 75, 08/26/19; Doc. 77, 08/15/29; Doc. 79, 08/29/19; and, Doc. 115, 02/10/20.

between rival groups at the prison. *Id.* at ¶ 32. Because of these threats, Sayles requested to be removed from general population and transferred to protective custody in the Special Housing Unit ("SHU"). *Id.*

In March 2014, Sayles was transferred to USP Canaan. *Id.* at ¶ 42. Sayles requested to be placed in the SHU at USP Canaan. *Id.* Sayles believed that he was labeled a "snitch" and would be a target of violence from other inmates. *Id.* at ¶ 43. On March 18, 2014, Sayles was transferred to the SHU and was placed in a cell alone. *Id.* at ¶ 58.

On May 6, 2014, Joseph Wing ("Wing"), another inmate at USP Canaan, assaulted an African American inmate. *Id.* at ¶¶ 73-74. On May 7, 2014, Wing was transferred to the SHU. *Id.* at ¶ 75. Wing proceeded to attack his cellmate – another African American inmate. *Id.* at ¶¶ 75-76. Wing told prison staff that he would not tolerate having an African American cellmate. *Id.* at ¶ 84. Further, Wing told prison staff that if the prison assigned him another African American cellmate, he would kill him. *Id.*

On May 16, 2014, Wing was placed in the SHU cell with Sayles. *Id.* at ¶ 88. Wing threatened and physically attacked Sayles. *Id.* at ¶ 92. Sayles pushed the duress button in the cell. *Id.* However, prison staff did not respond to Sayles's duress call for twenty (20) minutes. *Id.* at ¶ 98. When they arrived, prison staff observed Wing choking Sayles with a towel and striking Sayles head off of the floor. *Id.* Wing told

prison staff: "I'm not going to be celled with a black guy. I'm going to break his fucking neck. I'm going to kill this nigger." *Id.* at ¶ 100. Wing placed his knee on Sayles's back, continuing to choke him with the towel. *Id.* at ¶ 101. Prison staff deployed a pepper ball launcher in an attempt to get Wing to release Sayles. *Id.* at ¶ 103. Wing, eventually, stopped the attack. *Id.* at ¶ 104.

> As a result of the attack,

> Sayles was rendered unconscious. He was taken under medical care and was determined to have suffered hypoxic brain trauma, other trauma, became comatose and is in a chronic vegetative state. He was and is unable to communicate in either a verbal or nonverbal way, secondary to his medical and psychological limitations. He is expected to remain in such a medical and psychological status in the future.

*Id.* at ¶ 108.

During the subsequent FBI investigation regarding the attack, Wing told investigators that he did not want to live with an African American cellmate and that he warned staff that he would continue this conduct if the prison continued to assign him African American cellmates. *Id.* at ¶ 105.

On June 24, 2014, Wing was charged with assault and attempted murder. *Id.* at ¶ 106. On January 15, 2015, during his change of plea and sentencing hearing, Wing stated:

> [I]t's clear to even the biggest idiot that I was put in that cell by staff to exploit my racial views knowing I would attack this dude . . . The whole thing is, this whole situation happened because of staff playing games. Now, besides all of that, I have no problem handling my business when I have to. I'm just pointing out that basically I was exploited.

*Id.* at ¶ 107.

On September 27, 2016, Plaintiff, the mother, personal representative, and legal guardian for Sayles, initiated this civil suit by filing a Complaint. (Doc. 1). On November 7, 2016, Plaintiff filed her First Amended Complaint (Doc. 6). On March 22, 2017, Plaintiff filed her Second Amended Complaint (Doc. 23). In her Second Amended Complaint, Plaintiff seeks damages from Defendants for injuries sustained by Sayles during the attack by Wing.

In her Second Amended Complaint, Plaintiff names the following Defendants:

1.    Charles E. Samuels, Jr. (Director of the BOP);

2.    Joseph L. Norwood (Regional Director of the Northeast Region of the BOP);

3.    David J. Ebbert (Warden at USP Canaan);

4.    Robert Kaszuba (Captain at USP Canaan);

5.    Brian Sudul (Lieutenant at USP Canaan);

6.    Fuller (Correctional Officer at USP Canaan);

7.    Todd Oliver (Counselor at USP Canaan for Sayles);

8.    James Durkin (Counselor at USP Canaan for Wing);

9.    Gonzalez (Lieutenant at USP Canaan);

10.    John Gintz (Special Investigative Agent at USP Canaan);

11.    Anthony Pedone (Lieutenant at USP Canaan);

12.    Wladimir Vizcaino (Lieutenant at USP Canaan);

13.    Richard Hagemeyer (Lieutenant at USP Canaan);

14.    Shawn Vinton (Correctional Officer at USP Canaan);

15.    Cory McCauley (Correctional Officer at USP Canaan); and

16.    United States of America.

(Doc. 23, ¶¶ 5-27).

In her Second Amended Complaint, Plaintiff raises nine (9) counts against

Defendants:

1.  Count I – Eighth Amendment: Failure to Protect (against Defendants Ebbert, Kaszuba, Sudul, Fuller, Oliver, Durkin, Gintz, Gonzalez, Pedone, and Vizcaino);

2.  Count II – Eighth Amendment: Failure to Supervise (against Defendants Samuels, Norwood, Ebbert, and Kaszuba);

3.  Count III – Eighth Amendment: Failure to Intervene (against Defendants Gonzalez, Hagemeyer, Vinton, and McCauley);

4.  Count IV – Eighth Amendment: Failure to Intervene (against Defendants Hagemeyer, Vinton, and McCauley);

5.  Count V – First Amendment: Retaliation (against Defendant Sudul and all Defendants who participated in retaliatory acts against Sayles);

6.  Count VI – Federal Torts Claim Act: Negligence (against the United States of America);

7.  Count VII – Federal Tort Claims Act: Negligence, Failure to Intervene (against the United States of America);

8. Count VIII – Federal Tort Claims Act: Negligence, Failure to Conduct Rounds (against the United States of America); and

9. Count IX – Federal Tort Claims Act: Intentional Infliction of Emotional Distress (against the United States of America).

(Doc. 23, ¶¶ 128-190).

As relief, Plaintiff requests:

1. Compensatory damages as to all Counts;

2. Punitive damages as to Counts I – V;

3. Injunctive relief as to Counts I – V;

4. Declaratory relief as to all Counts;

5. Reasonable attorneys' fees and costs; and

6. Such other further relief as this Court deems just.

(Doc. 23, pp. 38-39).

On May 22, 2017, Defendants filed their Answer (Doc. 26). On February 5, 2019, Defendants Durkin, Ebbert, Fuller, Gintz, Gonzalez, Hagemeyer, Kaszuba, McCauley, Norwood, Oliver, Pedone, Samuels, Sudul, Vinton, and Vizcaino filed a Motion for Judgment on the Pleadings (Doc. 48) and a Brief in Support (Doc. 49). In their Motion, Defendants sought judgment on Plaintiff's *Bivens* claims – five (5) of the nine (9) total counts. On March 1, 2019, Plaintiff filed a Brief in Opposition (Doc. 56). On March 14, 2019, Moving Defendants filed a Reply Brief (Doc. 57).

The matter was referred to me to prepare a report and recommendation as to the Motion for Judgment on the Pleadings. On October 2, 2019, I issued a Report and Recommendation (Doc. 81), recommending that the Motion for Judgment on the Pleadings be denied in part and granted in part. In my Report, I recommended that the Motion be denied as to Count I, Count II, Count III, and Count IV. I recommended that the Motion be granted as to Count V only.

On December 3, 2019, Judge Mannion issued a Memorandum (Doc. 89) and Order (Doc. 90), adopting in part and not adopting in part my Report and Recommendation. Judge Mannion adopted my Report and Recommendation as to Count I, Count III, Count IV, and Count V. Judge Mannion did not adopt my Recommendation as to Count II (Failure to Supervise). Judge Manion ordered Count II of the Second Amended Complaint dismissed with prejudice. As a result of Judge Mannion's Order after the Motion for Judgment on the Pleadings (Doc. 48), the seven remaining claims are:

1. Count I – Eighth Amendment Failure to Protect (against Defendants Sudul, Fuller, Oliver, Durkin, Gonzalez, Gintz, Pedone, and Vizcaino);

2. Count III – Eighth Amendment Failure to Intervene (against Defendants Gonzalez, Hagemeyer, Vinton, and McCauley);

3. Count IV – Eighth Amendment Failure to Intervene (against Defendants Hagemeyer, Vinton, and McCauley);

4. Count VI – Federal Tort Claims Act – Negligence (against the United States of America);

5. Count VII – Federal Tort Claims Act – Negligence, Failure to Intervene (against the United States of America);

6. Count VIII – Federal Tort Claims Act – Negligence, Failure to Conduct Rounds (against the United States of America); and

7. Count IX – Federal Tort Claims Act – Intentional Infliction of Emotional Distress (against the United States of America).

(Docs. 89, 90). All pending claims against four Defendants—Samuels, Norwood, Ebbert, and Kaszuba—were disposed of by Judge Mannion's order. They are no longer parties to this case.

Currently pending before the Court is a Motion to Compel (Doc. 96). Before the motion was filed significant negotiations and court involvement occurred. On January 11, 2019, Plaintiff filed a letter with the Court outlining several discovery issues. (Doc. 46). On February 19, 2019, a telephone conference was held to address the discovery dispute. (Doc. 50). During that call the parties agreed to continue with discovery and agreed to contact the Court if further discussion was necessary.

Over the next several months, the parties continued to make progress with occasional guidance by the Court. Telephone conferences were held on: May 7, 2019; June 16, 2019; August 6, 2019; August 15, 2019; August 29, 2019, and February 10, 2020. (Docs. 66, 68, 75, 77, 79, & 115). During each of these telephone conferences, the parties reached some agreements, agreed that they had not yet

reached a complete impasse and continued to collaborate to resolve any discovery issues.

On January 9, 2020, a sixth telephone conference was held to address the remaining unresolved discovery issues in accordance with my November 27, 2019 Order (Doc. 88). Although many of the discovery issues were resolved by the parties, during the sixth telephone conference the parties agreed that they had reached an impasse as to the remaining discovery disputes and that discovery motions would be necessary.   I authorized the filing of a formal motion in accordance with court practice.

On February 24, 2020, Plaintiff filed a Motion to Compel. (Doc. 96). Along with her Motion, Plaintiff filed a Brief in Support. (Doc. 98). In her Motion and Brief, Plaintiff argues that there are disputes regarding thirteen (13) of the thirty-six (36) requests for production she made on November 26, 2019, and four "additional issues."

On March 20, 2020, Defendants filed their Brief in Opposition. (Doc. 110). In their Brief, Defendants reported that a few of the disputes were resolved by Defendants before they filed their Brief in Opposition. They also set forth their objections to the remaining disputes.

On April 13, 2020, Plaintiff filed a Reply Brief. (Doc. 117). On April 27, Defendants filed a Sur-Reply, without seeking leave of Court. (Doc. 118). This matter has been fully briefed and must now be resolved by the Court.

III.   **LEGAL STANDARD**

The scope of discovery that may be obtained under Federal Rule of Civil Procedure 26 is broad. Rule 26(b)(1) provides that:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

On motion by the parties, or on its own, the court must limit the frequency or extent of discovery otherwise allowed if it determines that "the discovery sought is unreasonably cumulative or duplicative", "can be obtained from some other source that is more convenient or less burdensome," "the party has had ample opportunity to obtain the information by discovery," or "the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(c). When imposing such limitations, courts should bear in mind the purpose of discovery—to "make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent," *United States v. Proctor & Gamble*

*Co.*, 356 U.S. 677, 682 (1958), and "narrow and clarify the basic issues between the parties," *Hickman v. Taylor*, 329 U.S. 495, 501 (1947).

Rule 34 of the Federal Rules of Civil Procedure governs the production of documents. Rule 34 provides that, during discovery, "[a] party may serve on any other party a request within the scope of Rule 26(b)" to produce documents "in the responding party's possession, custody or control." Fed. R. Civ. P. 34(a). "[T]he responding party is not obliged to produce documents that it does not possess or can not obtain." *Corradi v. New Jersey Parole Board*, No. 16-5076, 2019 WL 1795545 at *1 (D.N.J. Apr. 29, 2019)

Rule 37 of the Federal Rules of Civil Procedure provides that "[a] party seeking discovery may move for an order compelling answer, designation, production or inspection" if a party fails to produce or make available for inspection requested documents under Rule 34. Fed. R. Civ. P. 37(a)(3)(B)(iv). The party moving to compel discovery under Federal Rule of Civil Procedure 37 bears the initial burden of demonstrating the relevance of the requested information. *First Niagara Risk Mgmt., Inc. v. Folino*, 317 F.R.D. 23, 25 (E.D. Pa. 2016). If this initial showing is made, the resisting party can oppose by showing that the material requested is not relevant under Rule 26 or that the burdens of production outweigh the "ordinary presumption" in favor of disclosure. *Id.*

Rulings regarding the proper scope of discovery under Rule 26, and the extent to which discovery can be compelled pursuant to Rule 37 are considered non-dispositive. *Halsey v. Pfeiffer,* No. 09-1138, 2010 WL 3735702 at *1 (D.N.J. Sept. 17, 2010). A Magistrate Judge's discovery ruling "is entitled to great deference and is reversible only for abuse of discretion." *Id.* (quoting *Kresefky v. Panasonic Commc'ns and Sys Co.,* 169 F.R.D. 54, 64 (D.N.J. 1996); *see also George v. Pennsylvania Turnpike Comm'n*, No. 1:18-CV-766, 2020 WL 2745724 at *2 (M.D. Pa. May 27, 2020).

## IV.     ANALYSIS

In her Motion to Compel, Plaintiff argues that there are seventeen (17) unresolved issues of discovery. Some of these issues appear to have been resolved by the parties while this Motion was pending.

Given the numerosity and complexity of the issues presented by Plaintiff in her brief, I will address each request separately below—with one exception. Requests for Production 22, 27, and 28 are addressed together because Plaintiff and Defendant did not provide individual briefing on these requests in the Brief in Opposition or Reply Brief.

### A. DISCOVERY DISPUTES RELATED TO DEFENDANTS' RESPONSES TO PLAINTIFF'S NOVEMBER 26, 2019 DISCOVERY REQUESTS

In her Brief, Plaintiff argues that there are outstanding disputes related to Defendants' responses to her November 26, 2019 discovery requests. Those

requests, and Defendants' responses to them, appear on the Docket at Document

103-2. I will address each request, the response, and whether it was resolved after

Plaintiff's motion was filed.

### 1.    Request For Production #1 (Green Monster log book)

The relevant request and response are reproduced below:

1. All pages and notations from "The Green Monster" logbook for the
SHU at Canaan from May 1, 2014 through May 31, 2014.

**Response**: By May 2014, the so-called "green monster" was replaced
by the TRUSCOPE system. The United States will produce all daily
logs of SHU activity in TRUSCOPE from May 1, 2014 to May 31,
2014.

(Doc. 103-2).

Plaintiff argues:

Defendants produced a log which appears to reflect most of the
chronological events in the SHU from May 1, 2014 to May 31, 2014.
[DEF 22199-22329] The entries within these pages are in chronological
order and none appear to be out of sequence. However, the entries for
the time period from 10:57 pm on May 15, 2014 to 4:30 p.m. on May
16, 2014 are missing from that sequence. [*See* Ex. P-3] These missing
entries are crucial, because they encompass the time during which the
assault on Mr. Sayles occurred, as well as the time period immediately
preceding and following the assault. The detailed information
contained on these missing pages, such as which staff person(s)
escorted Wing to Mr. Sayles' cell, when that escort occurred, and any
other activity in the SHU during this time is highly relevant to this case.
Plaintiff needs these missing pages. Plaintiff asks the Court to order
Defendants to identify the Bates numbers for the Truscope entries from
May 15, 2014 at 10:57 p.m. to May 16, 2014 at 4:30 p.m. If the pages
containing these entries are not contained within Defendants'
production from January 24, 2020, Plaintiff asks the Court to order
Defendants to produce these missing pages from the Truscope system

(or to produce the same information from another one of Defendants'
systems).

(Doc. 98, p. 10) (internal footnote omitted).[4]

In their Brief in Opposition, Defendants report that they made additional
productions since Plaintiff filed her Motion to Compel, and that no issue remains on
Item 1. (Doc. 110, pp. 24-25). Defendants' filed a declaration in support of their
position, which states, in relevant part:

a.   **TRUSCOPE:** The TRUSCOPE system is designed to replace
BOP hard copy logbooks in the General Population and Special
Housing Units. Specifically, TRUSCOPE replaced confidential
entries previously made in hard copy log books, tracks inmate
property, tracks incidents throughout the institution, tracks
contraband, and tracks inmate activities within the hosing and
work areas. The Daily Activity Log Entry allows all TRUSCOPE
users to record an activity of interest, out of ordinary event(s) or
information, piece of intelligence, thereby conveying it to other
officers and users on future shifts.

b.   **Produced**. The TRUSCOPE SHU Daily Activity Logs can only
be printed by screenshot (CNTRL + P). The government official
providing the previous records neglected to scroll down to
capture the additional, previously missing entries when
screenshotting and sending the entries for that particular time
period. The omitted entries during the time period from 10:57 pm
on May 15, 2014 to 4:30 pm on May 16, 2014 are produced.

(Doc. 110-2, pp. 11-12).

---

[4] All page number references to documents filed to the ECF Docket correspond to
the page numbers assigned by the ECF system which appear in the headers at the
top of each document.

Plaintiff does not address her November 2019 Request for Production #1 in her reply. Defendants do not address this issue in their sur-reply.

Although there is no clear indication in the briefs whether Plaintiff is satisfied with Defendants' production of the TRUSCOPE SHU daily Activity Logs from May 15, 2014 through May 16, 2014, given their clear relevance and importance, I infer from Plaintiff's silence that this dispute has been resolved by the parties.

## 2.    Request for Production #2 (Wing's 292 Forms)

The relevant request and response are reproduced below:

2. Form 292's for Joseph Wing for the time period May 10-May 16, 2014.

**Response**: Defendants will produce Joseph Wing's entire Central File as it existed as of February 9, 2017, subject to the Stipulations and Order for the Confidential Treatment of Discovery Documents and Depositions, entered by the Court on November 9, 2018. The central file will contain all Forms 292 available for that time period.

(Doc. 103-2, p. 3).

Plaintiff argues:

A Form 292 is also known as a "Special Housing Unit Record" and contains information about the daily activities of each inmate in the SHU, including meals, recreation, showers, and other information based on observations of the SHU officers. [*See* Ex.P-4] The Form 292's are supposed to be maintained in each inmate's Central File.

Defendants state that they will produce Wing's entire Central File and that the file will contain all Form 292's available. [Ex.P-2 at #2] Plaintiff has reviewed the documents produced so far and has not been able to locate the Form 292's for Joseph Wing in the SHU for the time period May 11, 2014 through May 16, 2014, which is the six-day period leading up to the assault. Plaintiff asks the Court to order Defendants to

identify the Bates labels for these documents so that they can be located. If they have not been produced, Plaintiff asks the Court to order Defendants to produce them.

(Doc. 98, p. 11).

In response, Defendants report that they have been unable to locate any documents to produce in response to this request. After Plaintiff's Motion, Defendants filed a declaration that describes all the steps the BOP took to conduct a good faith search for these items. (Doc. 110, p. 25). That declaration states, in relevant part, that:

a.   When an inmate is assigned to SHU, the daily form BP-292 is created, sorted, and available in the institution-specific electronic Special Housing Unit Application "SHU Program" for as long as the inmate remains in the SHU at that respective location. There is no nationwide SHU program database. The BP 292 form is a unit record and served to track three daily meals, showers, exercise or out of cell time, and medical staff contacts. Each form contains 7 available entry days. The BP-292 is informally referred to as a "rec and shower sheet" and the BP-292's are printed from the SHU Program each week and placed in the institutional unit team mailbox associated with that particular inmate. It is the responsibility of the assigned unit team to retrieve the BP-292 forms and appropriately file them in the inmate's central file (either in Section 4 or the FOI exempt section if there is separation information on the form). When an inmate leaves the SHU, the inmate no longer exists in that institution's SHU program and the BP-292's are no longer available in the SHU program. The only location of the form moving forward is the inmate central file.

b.   Any other inmates who are CIM PP10 Separations from the inmate in that particular SHU or institution at that given time are noted in the "Separation Information" portion of the BP-292, however, the BP-292 is not utilized to record or track inmate

activities of interest, out of ordinary events or information, observed behaviors, or pieces of intelligence. Keep Away From ("KAF") or similar notations are not made on a BP-292 form. If the BP 292 form contains Separation Information the BP-292's are stored in the FOI Exempt Section of the central file instead of Section 4, where they are ordinarily kept per BOP Program Statement 5800.17, *Inmate Central File, Privacy Folder, and Parole Mini-Files*.

c.   Wing's entire Central File was copied and scanned by a government official in 2017. The entirety of the file was produced by the government on January 22, 2020, to include every BP-292 filed by his unit teams at various locations across the United States. Wing's Central File containing all existing BP-292 forms is currently at USP Florence. I contacted USP Florence and his Central File was searched for any BP-292 forms in Section 4 and the FOI Exempt Section covering May 10, 2014, to May 16, 2014. On January 22, 2020, Wing's current Case Manager at ADX Florence searched the Central File and did not locate any BP-292's for May 10, 2014, to May 16, 2014. His central file is the only place these documents would be stored.

(Doc. 110-2, p. 12).

Plaintiff does not address this request in her Reply. Defendants do not address this issue in their sur-reply.

Defendants explain in detail that they cannot find the requested Form BP-292 documents for Joseph Wing and have provided an affidavit detailing their search. Because Defendants do not appear to be in possession of these documents, and because Plaintiff has not raised any argument challenging the adequacy of their effort to search, the request is denied.

### 3.   Request for Production #3 (Sayles 292 Forms)

The relevant request and response are reproduced below:

3. Form 292's for Donshay Sayles for his entire time at Canaan.

**Response**: After concluding a reasonable search, the United States has been unable to locate Forms 292 for Donshay Sayles. Specifically, Mr. Sayles' Central File does not contain Forms 292, and the Bureau of Prisons has been unable to locate them elsewhere.

(Doc. 103-2, p. 3).

Plaintiff argues:

Defendants did not produce *any* of Mr. Sayles' Form 292s. It is Plaintiff's understanding that these documents are to be maintained in the inmate's Central File and that the Central File itself is maintained for 30 years after the expiration of the inmate's sentence. Defendants state that they conducted a "reasonable search" for these documents. [Ex.P-2 at #3] However, they do not provide any details regarding who conducted the search and what it consisted of. Without this information, it is not possible for the Court to determine whether the search was "reasonable." And it is not possible for Plaintiff to get more information from the BOP staff person who conducted the search without learning their identity. Plaintiff needs these forms as they contain information pertaining to Mr. Sayles' time in the SHU at Canaan, which is a key focus of this case. Plaintiff asks the Court to order Defendants to provide more information regarding the search that Defendants conducted for these forms, including the name(s) and title(s) of the individual(s) who conducted the search.

(Doc. 98, pp. 11-12).

In response, Defendants report that they have been unable to locate any documents to produce in response to this request. After Plaintiff's Motion, Defendants filed a declaration that describes all the steps the BOP took to conduct a good faith search for these items. (Doc. 110, p. 25). That declaration states, in relevant part, that:

a.   BOP uses the Inmate Central File to maintain pertinent information regarding detainees, unsentenced, and sentenced offenders. Unit Management creates and maintains inmate Central Files, whereas Correctional Systems coordinates the internal and external movement of Central Files and Central Files materials. Inmates who were previously classified and transferred from other Bureau institutions ordinarily do not need to have another Inmate Central File created. The six-part inmate Central File is maintained at the current or last institution or facility of confinement.

b.   Section Four of the Central File (Discipline, Work, Education Reports, etc.) contains all BP-292's unless the 292 is FOI Exempt due to inclusion of PP10 CIM Separation information as noted above. A Separate "Privacy Folder" contains FOI exempt information, to include a BP-292 that contains Separation Information.

c.   Sayles' Central Files was located at FMC Butner, the last institution of confinement prior to his release. Previous agency counsel requested and receive the entire Central File from FMC Butner on February 7, 2017, and it was produced. The physical central file is now secured at USP Lewisburg. I personally reviewed the entire Central File, to include Section 4 and the FOI Exempt privacy folder. There are no BP-292s in the Central File and there is no other location where a BP-292 pertaining to Sayles would be stored.

d.   On February 18, 2014, Sayles' went directly to the USP Canaan SHU upon his arrival and exclusively resided there – never residing in the assigned general population unit. This may have impacted the familiarity of the assigned unit team with him and ultimately the retrieval and placement of the BP-292's in the central file.

(Doc. 110-2, pp. 13-14).

Plaintiff does not address this request in her reply. Defendants do not address this request in their sur-reply.

In her request for production, Plaintiff requests that Defendants provide "more information regarding the search that Defendants conducted for these forms, including the name(s) and title(s) of the individual(s) who conducted the search." In their affidavit, Defendants have done so. Plaintiff has not raised any objection to the adequacy of Defendants' effort to locate the requested documents. Accordingly, I find that this request has been resolved by the parties.

### 4.    Request for Production #6 (Rounds check sheets)

The relevant request and response are reproduced below:

6. Rounds check sheets for Correctional Officers in the SHU for the time period May 1, 2014 through May 31, 2014.

**Response**: The United States will produce these materials, subject to the Stipulations and Order for the Confidential Treatment of Discovery Documents and Depositions, entered by the Court on November 9, 2018.

(Doc. 103-2, p. 4).

Plaintiff argues:

Defendants respond that they will produce the Rounds Check Sheets subject to the Protective Order (ECF. 44) in place in this case. [Ex.P-2 at #6] Plaintiff has reviewed the most recent production of documents made on January 24, 2020 (DEF 022199- 024026) and has not located these documents. Rounds Check Sheets contain critical information regarding activity in the SHU during the time leading up to, encompassing, and following the assault on Mr. Sayles. [Ex.P-5, example] Plaintiff asks the Court to order Defendants to identify the Bates labels for these documents so that they can be located. If they have not yet been produced, Plaintiff asks the Court to order Defendants to produce them.

(Doc. 98, p. 12).

In response, Defendants report that they have been unable to locate any documents to produce in response to this request. After Plaintiff's Motion, Defendants filed a declaration that describes all the steps the BOP took to conduct a good faith search for these items. (Doc. 110, p. 25). That declaration states, in relevant part, that:

a. The daily 30 minute round check sheet are initiated by SHU Staff and located at the end of each range hanging on a clipboard. This form is kept in the housing unit with the normal daily paperwork. The unit officer is responsible for ensuring checks are made and documented accordingly. 30 minute irregular rounds are to be conducted and documented in the time column. Once completed the form is forwarded to the Lieutenant's Office after the evening watch shift. The Morning Watch Operations Lieutenant reviews the form and forwards it to the Captain's Office for recordkeeping.

b. There is no RIDS [Records and Information Disposition Schedule] policy specific to 30 Minute Round Check Sheets.

c. The USP Canaan Captain's Office was searched and there were no round check sheets located from 2014. There are no other locations where BOP or USP CAA would otherwise store a copy of the physical round check sheet from that time period. However, in TRUSCOPE, the SHU Officer in Charge completes a log entry at the end of each shift indicating all 30 minute irregular rounds were completed. The May 2014 TRUSCOPE SHU Daily Activity Logs produced contain the SHU OIC Officer Rounds confirmation entries sought by ITEM 6. *See* DEFENDANT022199 through 022328 and productions responsive to ITEM 1.

(Doc. 110-2, p. 13, Item 6).

In her Reply Brief, Plaintiff argues:

Defendants provided a declaration from BOP Attorney Jonathan Kerr, which asserts that there is no RIDS policy for the 30 Minute Rounds Check Sheets and that no Rounds Check sheets from 2014 were located after a search was conducted. [Second Kerr Decl., ECF No. 110-2 at 13, # 6 (b), (c)] A notation at the bottom of the Rounds Check Sheet indicates that the document is to be kept for a year. [See Ex. P-5 to motion to compel, DEFENDANT023938] On June 11, 2014, less than a month after the May 16, 2014 assault, Plaintiff's Attorney Christopher Heavens wrote to Warden Ebbert and asked that all video surveillance and documents related to the May 16, 2014 incident and documents related to the investigation into the incident be preserved. [Ex. P-20, DEFENDANT 001758-1759, attached hereto]. Plaintiff asserts that the Rounds Check Sheet for May 16, 2014 would have been important in any investigation into this assault because it would have identified specific staff members who conducted SHU rounds at the time of the assault. Therefore, in addition to being retained for one year after May 16, 2014, in accordance with the requirement on the check sheet itself, these documents should have been preserved pursuant to Attorney Heavens' letter.

Plaintiff needs additional information surrounding the disposition of the Rounds Check Sheets for May 2014, and in particular the May 16, 2014 check sheet, in order to determine whether there is sufficient evidence to support a spoliation claim. Plaintiff would like to pursue this information by questioning the BOP employees who were responsible for preserving the Rounds Check Sheets at issue here at an evidentiary hearing on the motion to compel.

(Doc. 117, pp. 1-2) (internal footnote omitted).

In their Sur-Reply Brief, Defendants argue:

Plaintiff sought the production of all "rounds check sheets" for the month of May 2014. The BOP's search for those documents yielded no results. Dkt. No. 110- 2, ¶ 6c. Mr. Kerr explained that, once each rounds check sheet is completed, the Morning Watch Operations Lieutenant reviews it and forwards it to the Captain's Office. The BOP, therefore, reasonably searched the Captain's Office for these materials but found

none from 2014. *Id.* This result was unsurprising because there is no Records Inventory and Disposition Schedule ("RIDS") policy specific to these materials. *Id.* ¶6b. Mr. Kerr notes, however, that the SHU Officer in Charge completes in the TRUSCOPE system an entry at the end of each shift confirming the completion of all rounds. Defendants have produced all TRUSCOPE SHU Daily Activity Logs to show this confirmation for the month of May 2014. *Id.* ¶6c. Therefore, ***the Defendants have already provided the information Plaintiff seeks, albeit in a different form***.

Plaintiff notes that the exemplar rounds check sheet attached as Exhibit 5 to her motion indicates the Captain should keep these records "for a period of a year." This neither contradicts Mr. Kerr's testimony as to the absence of RIDS policy nor establishes these documents exist. To explain further, Defendants provide the Third Declaration of Jonathan Kerr, wherein he again confirms that no RIDS policy exists for rounds sheets and explains that the notation cited by Plaintiff in Exhibit 5 is a "unilaterally developed retention schedule by Correctional Services without approval from the Archivist of the United States and the National Archives and Records Administration (NARA)." *Id.* Mr. Kerr's prior testimony as to the absence of a RIDS policy relevant to these forms, therefore, remains true and correct.

Even if the cited notation created an obligation to retain each rounds check sheet for one year, as Plaintiff suggests, those records still would have been destroyed by the time Plaintiff propounded her discovery request. While Plaintiff cites to Mr. Heaven's June 2014 Letter addressed to the then-warden of Canaan as a "litigation hold request," the substance of the letter requested preservation of "video surveillance" and "all evidence, paper and electronic, relating to this incident or investigation into this incident." The rounds check sheet is not within the category of documents Mr. Heavens asked to be preserved. Mr. Heaven's letter did not raise any issue with BOP staff failing to conduct necessary rounds, and Plaintiff takes no issue regarding Defendants' preservation of materials regarding its investigation into the altercation between Wing and Sayles.

Finally, in advancing her spoliation suggestion, Plaintiff claims that the rounds check sheets "would have identified specific staff members who conducted SHU rounds at the time of the assault." Dkt. No 117 at 2.

> Plaintiff ignores that, in addition to the TRUSCOPE entries, Defendants already produced the range video, which depicts the BOP personnel who were making rounds at the time they discovered the ongoing altercation between Wing and Sayles. Plaintiff, therefore, has an alternative source of information – appropriately preserved by the BOP – to discover the same facts. Plaintiff's urged need for a hearing to determine whether a spoliation claim exists, therefore, falls flat.

(Doc. 118, pp. 12-14) (internal footnote omitted).

Defendants have provided sufficient proof that they are not in possession of the requested rounds check sheets, and that the round sheets likely do not exist anymore. Therefore, I cannot compel Defendants to produce documents that Defendants do not have possession of or that no longer exists.

To the extent Plaintiff requests a spoliation hearing, she has not shown that the identity of the officers conducting rounds checks on days other than the incident in question would be relevant. Plaintiff has been provided with rounds videos and TRUSCOPE entries that identify those individuals who conducted rounds on the day of the incident. Furthermore, Plaintiff has not shown that the rounds check sheets fall within the scope of documents requested by Attorney Heavens in his preservation letter of May 16, 2014. Accordingly, Plaintiff's request to conduct a spoliation hearing is denied.

### 5.   Request for Production #9 (May 14, 2014 Daily Log)

The relevant request and response are reproduced below:

9. May 14, 2014 Lieutenant's Logs (aka "Daily Log") at Canaan.

> **Response**: After concluding a reasonable search, the United States has
> been unable to locate this document.

(Doc. 103-2, p. 4).

> Plaintiff argues:

> Defendants state that after conducting a reasonable search, they have
> been unable to locate the May 14, 2014 Lieutenant's Log. [P-2 at #9]
> Defendants do not provide any details regarding the search. Plaintiff
> needs this log because it contain[s] information related to activity in the
> institution two days before the assault on Mr. Sayles. Plaintiff asks the
> Court to order Defendants to provide information regarding the search
> that Defendants conducted for these forms, including the name(s) and
> title(s) of the individual(s) who conducted the search.

(Doc. 98, pp. 13-14).

In response, Defendants report that they made additional productions after

Plaintiff's Motion was filed and believe that no issue remains on item 9. (Doc. 110,

p. 25). In support of this position, Defendants' submitted an affidavit, which states

in relevant part:

> a.   **Produced**. Due to typographical error, there were two produced
>      Lieutenant Logs with a May 15, 2014, date assigned that were
>      located in the Captain's Secretary Office at USP Canaan. *See*
>      DEFENDANT008181-8190.      Additionally,    a    government
>      official located electronic versions of both in an electronic group
>      drive. The word document accurately labeled the file as "May
>      14, 2014" but with the misleading typographical error indicating
>      May   15,   2014,   in   the   body   of   the   log   is   located   at
>      DEFENDANT008181-8185. This is the requested May 14,
>      2014, Lieutenant's log in question.

(Doc. 110-2, p. 14).

In her Reply Brief, Plaintiff admits that the May 2014 Lieutenant Log was produced in March 2020. (Doc. 117, p. 13 n. 5).

Accordingly, I find that this issue has been resolved by the parties.

### 6. Request for Production #11 (Wing "Sensitive Report" Information)

The relevant request and response are reproduced below:

11. "Sensitive Report" information for Joseph Wing for the time period during which Wing was not in the SHU at Canaan, from the date of his arrival at Canaan until May 6, 2014. [Note: if the "sensitive report" information is only kept on the Lieutenant's Logs (aka the institution "daily log') then we request those Lieutenant' Logs. If the "sensitive report" information exists in a different format, such as a memo, note, or email, request those documents as well.]

**Response:** The United States will produce the only "Sensitive" Log in TRUINTEL referencing Joseph Wing between December 10, 2013 to May 6, 2014, subject to the Stipulations and Order for the Confidential Treatment of Discovery Documents and Depositions, entered by the Court on November 9, 2018. *See also* Lieutenant Logs previously produced (e.g., DEFENDANT008123). The Bureau of Prisons is searching for any additional responsive materials.

(Doc. 103-2, p. 5).

Plaintiff argues:

Defendants produced one document in response to this request for Sensitive Reports on Joseph Wing (DEFENDANT02384) and state that the Bureau of Prisons is searching for any additional responsive materials. [Ex.P-2 at #11] Plaintiff asks the Court to order Defendants to supplement their response with any additional responsive documents.

(Doc. 98, p. 13).

In response, Defendants report that they have been unable to locate any documents to produce in response to this request. After Plaintiff's Motion, Defendants filed a declaration that describes all the steps the BOP took to conduct a good faith search for these items. (Doc. 110, p. 25). That declaration states, in relevant part, that:

a.   A TRUSCOPE Sensitive Information Log Entry is used to impart information or intelligence to the Special Investigative Services Department and the function is available to all TRUSCOPE users. Captains and SIS Lieutenants review Sensitive Log entries daily. A submitted Sensitive Log Entry in TRUSCOPE populates and combines TRUINTEL Sensitive Log Entry Report for that respective institution and is searchable in the system by date range. There is no ability to independently search by inmate name, Federal Register Number, or cell. However, once the report for a given date range populates you are able to search within the report by inmate name.

b.   Both USP Canaan and BOP Central Office were unable to retrieve any Sensitive Log entries pertaining to CAA prior to December 20, 2013, and after further inquiry it is unknown whether that is the case because there were no entries made prior to December 20, 2013, or whether the system purged. We produced all CAA Sensitive Log Entry Reports pertaining to Joseph Wing from December 20, 2013, to May 31, 2014, which consistent of an April 5, 2014, entry about a suspicious meeting between Wing and 3 other inmates in B-1 Unit. There are no other responsive documents or other areas were a Sensitive Report is stored.

(Doc. 110-2, p. 14).

In her Reply Brief, Plaintiff confirms that Item #11, has been resolved through responses provided by Defendants in March 2020. (Doc. 117, p. 13 n. 5).

### 7.    Request for Production #20 (Lieutenant Meetings Course List)

The relevant request and response are reproduced below:

20. List of courses offered at the monthly Lieutenant's Meetings at USP Canaan for the time period 2009 through 2014, in order to determine whether any of these courses fall into the requests we have previously made for information regarding training.

**Response**: After concluding a reasonable search, the United States has been unable to locate any responsive materials.

(Doc. 103-2, p. 8).

Plaintiff argues:

Defendants response- unable to locate any responsive materials. Defendants do not provide any details regarding who conducted the search and what the search consisted of. Without this information, it is not possible for the Court to determine whether the search was "reasonable." And it is not possible for Plaintiff to get more information from the BOP staff person who conducted the search without learning their identity. Plaintiff asks the Court to order Defendants to provide information regarding the search that Defendants conducted for these forms, including the name(s) and title(s) of the individual(s) who conducted the search.

(Doc. 98, p. 13).

In response, Defendants report that they have been unable to locate any documents to produce in response to this request. After Plaintiff's Motion, Defendants filed a declaration that describes all the steps the BOP took to conduct a good faith search for these items. (Doc. 110, p. 25). That declaration states, in relevant part, that:

     a.    There are no "courses" offered at monthly Lieutenant Meetings and no hard copy material distributed or generated from the meetings. Lieutenant Meetings ordinarily follow the scheduled Department Head Meeting. Lieutenant Meetings are specifically *not* about inmates. Instead, it is convened to familiarize, discuss and assess new staff, staffing changes, staff rosters, staff issues, scheduling conflicts, planned leave, paperwork, implementing new directives (either local or national), and current facilities projects that impact the Correctional Services operation. The Captain's Secretary takes attendance and records minutes. The Captain and Lieutenant offices at CAA were searched for the minutes with nothing responsive located. Additionally, the USP CAA Captain Secretary searched the local electronic group drive, which contained records from 2016 to present. There are no other areas where Lieutenant Meeting minutes are stored and no RIDS policy specific to Lieutenant Meeting minutes.

(Doc. 110-2, pp. 14-15).

In her Reply Brief, Plaintiff argues:

This request seeks a list of courses offered at the Monthly Lieutenants Meetings so that Plaintiff can determine if any of these courses are encompassed by discovery requests for training materials. Defendants respond that there are no "courses" offered at the Monthly Lieutenants Meetings, and that these meetings are not about inmates but, rather, are for discussing staffing matters and some other matters. [*See* Second Kerr Decl., ECF No. 110-2 at 14, # 9(a)] Defendants also state that meeting minutes are taken and that a search for meeting minutes was conducted of the Captain and Lieutenant's office "with nothing responsive located." [Id.]

During discovery, Plaintiff obtained sign-in sheets for the Lieutenants' meetings which indicate that "courses" are presented at the meetings, at least some of which pertain to staff procedures for dealing with inmates. For example, during the September 18, 2012 meeting a course entitled "Protective Custody Requirements" was presented. [*See* Ex. P-21, DEFENDANT007822, attached hereto] Further, the sign-in sheets show that several of these courses were attended by at least two Defendants in this case – Lieutenant Sudul and SIA Gintz. [*See* id.]

Consequently, Plaintiff maintains that information regarding these courses is relevant and discoverable, and Plaintiff seeks more information concerning the searches for meeting minutes. In particular, Plaintiff requests copies of the Minutes which were located, in order to ascertain if any additional training-related courses which relate to the issues in this case were offered from 2009 to 2014.

(Doc. 117, pp. 3-4) (internal footnote omitted).

In their Sur-Reply, Defendants argue:

Plaintiff continues to seek production of "courses offered at the monthly Lieutenant's Meetings at USP Canaan for the time period of 2009 through 2014" despite being repeatedly advised that "[t]here are no 'courses' offered at the Lieutenant Meetings and no hard copy material distributed or generated from the meetings." Dkt. No. 110-2 ¶ 9a. The Court cannot compel Defendants to produce documents that have never existed.

Plaintiff references a single sign-in sheet, which she attaches as Exhibit 21, that includes the phrase "Protective Custody Requirements" to speculate that formal trainings *did* take place during these meetings. As the Third Declaration of Jonathan Kerr explains, this is not a reference to a training course. *See* Third Kerr Dec. ¶ 4a. Instead, it is a reference to occasional, informal presentations done by the Special Investigative Services Department at the Lieutenant Meetings. Critically, Mr. Kerr explains that these presentations are not training and ***do not include distribution of hard copy materials***.

Despite this, Plaintiff now demands to review years' worth of meeting minutes searched by the BOP in its effort to find responsive materials, as referenced in the Second Declaration of Jonathan Kerr. Dkt. No. 110-2 ¶ 9a. She rationalizes her irregular request by referencing that Defendants had only recently produced a video of an FBI interview of Wing. *See* Dkt. No. 117, fn. 2. This is comparing apples to oranges. The U.S. Attorney's Office only recently obtained that video and the accompanying report, and only did so after defense counsel ***made two separate requests to FBI's archives***. The Government took these extraordinary efforts in good faith to be as thorough as possible in its search of potential sources of responsive information, even though it

did not have an obligation to search that source. It would be patently unfair for Plaintiff to seize on the fruits of Defendants' extraordinary efforts as grounds to question Mr. Kerr's credibility.

(Doc. 118, pp. 15-16).

What is the difference between a "course" and an "informal presentation?" Defendants suggest that a "course" would have formal written materials but an "informal presentation" would just be an occasional briefing. Believing that "Courses" were offered, Plaintiff proffers a sign in sheet (Doc. 117-2) for a "Monthly Lieutenants Meeting" by someone whose title is listed on the sign in sheet as "Instructor." However, on the same sign in sheet, the "Course Code" is left blank. The "Instructor" is not named, but simply listed as "SIS Lieutenant." I take Defendants' representation at face value that this document (Doc. 117-2) is evidence that a monthly meeting took place and that the subject of the meeting was "Protective Custody Requirements." The SIS Lieutenant who gave the briefing did so informally. Plaintiff points to no record keeping requirements for informal presentations. Finding none, this request for production of a list of "courses" offered at Lieutenant's Meetings is denied.

## 8.    Request for Production #26 (Portions of 3 Manuals)

The relevant request and response are reproduced below:

26. Chapters/ sections from the SIS Manual, Correctional Services Manual, and CIMS manual on list submitted to defense counsel.

**Response**: The United States objects to the production of these materials because they are irrelevant to the questions of whether the United States was negligent or whether any of the individual defendant violated the constitutional rights of Mr. Sayles. Moreover, due to the extreme sensitive nature of the requested information and its irrelevance, its production would be disproportional to the needs of the case and impose a burden that outweighs any benefit. Finally, the requested materials are protected from disclosure by the law enforcement privilege.

(Doc. 103-2, p. 11). In her argument, Plaintiff references "Exhibit 17" as "a three-page document to defense counsel stating why each chapter was relevant and discoverable," submitted to Defendants by Plaintiff. (Doc. 98, p. 20). Because no other list was provided, I infer that Plaintiff's Exhibit 17 (Doc. 103-17) identifies the chapters sought.

Plaintiff argues:

Defendants Response- Objection- irrelevant; production disproportional to the needs of the case; burdensome; law enforcement privilege. [Ex.P-2 at #26]

*The BOP manual documents are relevant and discoverable.*

Plaintiff alleges that high-level BOP employees had duties and responsibilities for managing, overseeing, and supervising the staff and activities at the institution level and for ensuring that policies and procedures related to institutional safety and security were followed. [ECF No. 23, Am. Compl. ¶¶ 5-8] The Amended Complaint also asserts that BOP employees are required to comply with BOP policies and procedures, including those found in "other documents created and maintained on the institutional, regional and national levels of the BOP." [*Id.*, ¶ 126] Information requested from the CIMS manual, the Correctional Services Manual, and the SIS manual is relevant to duties and responsibilities and how they were to be carried out.

The pleadings demonstrate the discoverability of information from the SIS Manual. The Amended Complaint asserts that information about an inmate's placement in the SHU is contained in the inmate's file and other repositories and is reviewed by SHU staff, including Defendants Sudul, Gonzalez, Fuller, Vinton, and McCauley. [Am. Compl. ¶ 82] In their Answer, Defendants state that "the amount of information available to staff specifically depends on the reasons for an inmate's placement into special housing as well as the completion of the investigation related to his assignment in the SHU." [Answer, ¶ 82] Plaintiff also alleges that the Defendants had a duty to review Joseph Wing's past history of violence and disciplinary incidents in connection with his being housed in the SHU. [Am. Compl. ¶ 86] Defendants denied this allegation, stating that each Defendant had "various and distinct roles in the day to day operations of the institution. The management decisions involving how and where a particular inmate is housed falls within the obligations of certain staff members at the facility and as such not every staff listed was obligated to review the history of inmate Wing." [Answer, ¶86] The pleadings clearly show that there are factual disputes as to which BOP employees had duties, responsibilities, and knowledge pertaining to the housing of Joseph Wing in the SHU. What the Defendants knew about Mr. Sayles and Joseph Wing before the May 16, 2014 assault is a key issue in this case. The role of the SIS Department and the gathering and sharing of information about inmates, in particular Mr. Sayles and his attacker Joseph Wing, is a seminal issue. The SIS Manual chapters requested will contain relevant information on these key questions[.]

The Correctional Services Manual contains procedures to be followed by BOP staff in the day-to-day operations of the institution (such as conducting rounds), inmate control and management, as well as in situations calling for use of force and response to emergencies. The CIMS (Central Inmate Monitoring System) Manual is relevant and discoverable as it provides information on tracking inmates and issues relating to separation, etc.

BOP post orders, position descriptions, and program statements show how important these manuals are in the day-to-day operations of the prison. The SHU post orders state that staff should be familiar with the content of the Correctional Services Manual regarding Use of Force and Application of Restraints. [*See* Ex.P-16 (excerpts of post orders,

position descriptions, etc.), at GOV001066, ¶3] The post orders also refer to other specific directives which must be followed by staff and which are contained in the Correctional Services Manual [*Id.*, ¶ 5] The position descriptions for the Special Investigative Agent (SIA) (Defendant Gintz in this case) and for SIS technicians refer to all three of these manuals as specific sources for guidance and information related to the duties of these positions. [Ex.P-16 at DEFENDANT001996, 002014, and 002015] The Captain's post orders require that Lieutenants have a thorough knowledge of the content of the Correctional Services Manual. [Ex.P-16 at DEFENDANT002144] Of particular relevance to this case, threat assessment investigations are to be conducted according the requirements of the SIS Manual. [Ex.P-16 at DEFENDANT002316] The program statement on Use of Force and Application of restraints (PS 5566.06) refers BOP employees to the Correctional Services Manual for information on the Use of Force Team Techniques. [Ex.P-16 at DEFENDANT003835]

These manual chapters contain information about the duties of BOP employees, the procedures they are supposed to follow, and the information they have access to. Denying Plaintiff access to this information would unfairly obstruct his ability to pursue his claims. *See, e.g., Johnson v. Wetzel*, Civ. No. 1:16-863, 2016 WL 4158801 (M.D. Pa. Aug. 5, 2016) (Conner, J.) (granting prisoner plaintiff's motion to compel as to requests for policy-related documents because such documents were at the "core" of plaintiff's constitutional claims).

*Defendants should be compelled to produce these documents*.

Information in these manuals is also relevant to the question whether the discretionary function exception applies to the FTCA claims in this case. In FTCA cases involving the discretionary function exception, discovery is necessary to determine the significance of program statements, the existence of other mandatory directives, and whether prison staff violated the directives. *See e.g., Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir. 2001) (recognizing the impossibility of plaintiff's establishing the existence of a mandatory duty without discovery and reversing dismissal based on lack of jurisdiction).

Defendants must be ordered to produce the manual chapters because Plaintiff's counsel has already reviewed them and determined that they

contain relevant information. On July 23 and 24, 2019, Plaintiff's counsel Jay T. McCamic and Jennifer Tobin reviewed the SIS Manual, Correctional Services Manual, and the CIMS manual at the BOP's Northeast Regional Office in Philadelphia. After conducting that review, Plaintiff's counsel reviewed their notes and submitted a list to defense counsel of the chapters from each manual that they requested be produced. Defense counsel asked for an explanation why Plaintiff's counsel believed each section was discoverable. On August 1, 2019, Plaintiff's counsel provided a three-page document to defense counsel stating why each chapter was relevant and discoverable. (Ex.P-17 "Discoverability of Manual Sections") Defendants have not responded to Plaintiff's reasons or provided any specific support for their generalized objection to producing these chapters. The documents themselves will be needed in order for Plaintiff to meet his burden of proof and to vouch the record.

The Protective Order provides protection from disclosure to the public of the information in the manuals as "Confidential Information" and expressly contemplates the production of the manuals. (*See* ECF No. 44 at 3)

When assessing a discovery request by a civil rights plaintiff for a governmental document, a court must balance the confidentiality of governmental files against the rights of a civil rights litigant by considering a number of factors so as to "…balance the public interest in the confidentiality of government information against the needs of a litigant to obtain data, not otherwise available to him, with which to pursue a nonfrivolous cause of action." *Frankenhauser v. Rizzo*, 59 F.R.D. 339, 344 (E.D. Pa. 1973). In this case, the factors weigh in favor of ordering Defendants to produce the requested chapters from the BOP manuals because: a) Plaintiff needs this information to pursue his claims and overcome the defenses of Defendants; b) Plaintiff's counsel has already viewed the material therefore it has already been disclosed – at this point Plaintiff is merely seeking copies of selected chapters, in conformance with Plaintiff's review; c) there is a protective order in this case which protects the information; d) Defendants have not provided any support for applying the law enforcement privilege, as required under Rule 26(b)(5), much less complied with the requirement in the Third Circuit that the head of the agency invoking the privilege must "personally review the material" and provide "precise and certain

reasons for preserving" the confidentiality of the material. *See United States v. O'Neill*, 619 F.2d 222, 226 (3d Cir. 1980) (citation omitted).

(Doc. 98, pp. 16-21). (emphasis in original) (internal footnote omitted).

In response, Defendants argue that the manuals should not be produced because the contain sensitive information and because they are not relevant.

On the issue of sensitivity, Defendants argue:

Plaintiff seeks the production of numerous sections of three highly-sensitive BOP manuals: The Correctional Services Manual, the Central Inmate Monitoring System ("CIMS") Manual, and the Special Investigative Services ("SIS") Manual (collectively, the "Manuals"). The Manuals contain sensitive information about how the BOP operates and manages federal institutions. The BOP keeps these materials confidential for security reasons, and releasing them could reveal to the public sensitive BOP techniques, such as, among other things, how it investigates crimes, how it tracks security threats inmates, and how it would combat a prison riot. *See* Second Declaration of Jonathan Kerr, attached as Exhibit B ("Second Kerr Dec."), at ¶¶11a-11k. The Manuals, therefore, are properly excluded from the production. *See Mercaldo*, 2016 WL 5851958, at *3-4 (denying the production of similar materials authored by the Pennsylvania Department of Corrections).

(Doc. 110, pp. 16-17) (internal footnote omitted).

On the issue of relevance, Defendants argue:

Even though the BOP typically does not allow anyone from the public to review the Manuals, given the nature of this case, Defendants made the unique accommodation of allowing Plaintiff's lawyers to analyze and take notes of the Manuals. Their review was robust. Two of Plaintiff's lawyers spent two entire days at BOP offices reviewing this material. Motion at 16. As revealed by Exhibit 17 to the Motion, however, Plaintiff used that opportunity to seek an unreasonably-broad selection of heavily-guarded information spanning 22 Chapters and 196 pages.

By way of example, Plaintiff seeks the production of Chapter 8 of the SIS Manual, entitled "Interview/Interrogation Techniques" even though there are no allegations regarding how Defendants investigated the altercation between Wing or Sayles. Release of this Chapter poses an obvious security risk, since it details the various techniques SIS officials use to elicit information from inmates when investigating incidents and crimes at BOP facilities. Second Kerr Dec. ¶11g. Plaintiff also seeks production of Chapter 6 of the same the Correctional Services Manual, entitled "Special Security Areas," which addresses topics such as processing visitors and deliveries. These and Plaintiff's other requests are not relevant to the facts alleged and are plainly disproportional to the needs of the case, especially when weighed against the BOP's security concerns.

Not only are the Manuals factually irrelevant, but the legal relevance is dubious. Plaintiff argues that the Manuals are "relevant to duties and responsibilities and how they were carried out." Motion at 13. In other words, in support of her FTCA claims, Plaintiff seeks to identify duties in the Manuals ostensibly breached by Defendants. But this justification ignores a fundamental principle of FTCA jurisprudence known as the "state analogue requirement," by which a plaintiff cannot rely on a *federal* statute, regulation, or agency policy to establish an actionable duty. Instead, a plaintiff must identify a state-derived duty to have an actionable FTCA claim. *See, e.g., Cecile Indus., Inc. v. United States*, 793 F.2d 97, 99 (3d Cir. 1986). This reflects the plain language of the statute itself, which provides that the United States can be liable only "under circumstances where the United States, if a private person, would be liable to the claimant *in accordance with the law of the place where the act or omission occurred*." 28 U.S.C. § 1346(b)(1) (emphasis added). Because Plaintiff cannot rely on anything in the Manuals to identify a "breached" duty, Plaintiff has no actual need, and the Court should not order the Defendants to produce them.

Plaintiff alternatively argues that she needs the Manuals because they relate to "the question whether the discretionary function exception applies to the FTCA claims in this case." Motion at 15. Plaintiff ignores that the BOP has already produced dozens of documents responsive to several requests seemingly targeted at this very issue, including the Directives Management Manual, the Correctional Systems Manual, the Correctional Services Procedures Manual, position descriptions,

specific post orders for each posting, BOP program statements, institutional supplements to those program statements, and Canaan-specific "special" instructions. And though the BOP drew a line at the Manuals because of their sensitive nature, it nevertheless allowed Plaintiff to inspect them to satisfy herself that she is missing nothing relevant to the discretionary function exception.

Plaintiff's implication that her request is limited to those sections relevant to the discretionary function exception is belied by its shear breadth – 196 pages over 22 Chapters. Because of the objective unlikelihood that such a significant volume is relevant to the discretionary function exception, and given the sensitive nature of the materials, the Court should not order their production. At most the Court should order Plaintiff to make a proffer to explain, precisely, how each section of each Chapter requested is relevant to this issue and then tailor the production to only those sections that the Court deems relevant to the discretionary function exception.

Finally, the Defendants do not understand Plaintiff to be relying on the *Bivens* claims as added justification for the production of the Manuals, but if she is, that argument must fail. Solely relevant to the Bivens claims is whether any individual Defendants violated a right derived from the Constitution, not whether they acted in conflict with BOP policy. *See Mercaldo*, 2016 WL 5851958, at *4 (denying the production of state counterpart "Manuals" because § 1983 claim turned on whether defendants "violated [plaintiff's] rights under the United States Constitution, not the Department's own policies"). The Manuals are plainly irrelevant to the *Bivens* claims.

(Doc. 110, pp. 17-20) (internal footnote omitted).

In her Reply Brief, Plaintiff argues:

Defendants argue that the "state analog requirement" makes the content of the BOP manuals irrelevant to the claims in this case because a "plaintiff cannot rely on a federal statute, regulation, or agency policy to establish an actionable duty." [Def. Br. at 14] This mischaracterizes Plaintiff's need for the information in the manuals. Plaintiff is not relying on the content of the manuals to establish a duty which Defendants breached as the basis for the negligence claims. The

negligence claims arise from Defendants' duty, established under Pennsylvania law, to exercise due care for the safety of the prisoners in their custody. This information is sought not to establish *duty*, but to identify the *actions* BOP employees are to perform in certain situations as well as the *information* they have available in performing those *actions*. Such information is relevant to the elements of both the Eighth Amendment and FTCA negligence claims. Furthermore, information about employees' duties and responsibilities contained in the manuals may be useful to support Plaintiff's claims if those duties are similar to the duties imposed under Pennsylvania law. *See Chen v. United States*, 854 F.2d 622, 626 (2nd Cir. 1988) ("While violations of federal statutes and regulations standing alone are insufficient, these violations do support FTCA claims when they constitute violations of duties analogous to those imposed under local law.") Indeed, *Cecile Indus. Inc. v. United States*, 793 F.2d 97 (3d Cir. 1986), cited by Defendants, acknowledges that the violation of statutes and regulations is relevant to the question whether a state tort has been committed. *See Cecile*, 793 F.2d at 100.

Defendants have not identified the type of privilege, if any, they are invoking in their refusal to produce the BOP manual excerpts. To the extent Defendants are asserting an executive privilege, they have not complied with the Third Circuit requirement to provide an affidavit from the *head of the agency* stating that he or she has personally reviewed the material, and which provides "a specific designation and description of the documents claimed to be privileged" and "precise and certain reasons for preserving [their confidentiality]." *See United States v. O'Neill*, 619 F.2d 222, 226 (3d Cir. 1980) (quoting *Smith v. Fed. Trade Comm'n*, 403 F. Supp. 1000, 1016 (D. Del. 1975) (emphasis added)). The affidavit of BOP counsel Jonathan Kerr does not satisfy these requirements because he is not the head of the agency and because the affidavit does not provide precise reasons for preserving the confidentiality of each manual portion Plaintiff seeks.

Even if Defendants had adequately supported their assertion of privilege, it would, at most, be a qualified privilege subject to the Court's balancing of the government's need for secrecy with the Plaintiff's need for the information. Defendants' asserted reasons for refusing to produce the manual sections are insufficient, given that Plaintiff's counsel have already reviewed them and determined that

they contain discoverable information and a protective order is in place which will safeguard the dissemination of the information. For all of these reasons, Defendants have not satisfied their burden of demonstrating that any privilege applies and precludes production. If needed to resolve this dispute, Plaintiff would be amenable to the Court's conducting an in camera inspection of the requested material.

Defendants argue that because they have produced other documents which contain information that may be relevant to the discretionary function exception, the Court should preclude Plaintiff from obtaining relevant information in these manuals. [Def. Br. at 15] This approach is patently contrary to the provision in Rule 26 that the scope of discovery encompasses any information that is relevant. It is not up to Defendants to choose which information Plaintiff may use to litigate his case.

(Doc. 117. pp. 10-13).

In their Sur-Reply, Defendants argue:

Plaintiff tellingly sidesteps Defendants' challenge to articulate the relevance of large swaths of the requested 22 Chapters of its confidential Manuals. There is no excuse for Plaintiff not to tailor her request to topically-relevant sections given that the BOP afforded her lawyers two full days' access to the Manuals. To be clear, for the reasons stated in their Opposition, Defendants contend that the Court should order production of none of the Manual sections. But the sheer scope and the facial irrelevancy of her request belies Plaintiff's insistence that she seeks only information relevant to the issues in this case. Nor has Plaintiff articulated how need for this information outweighs the United States' obvious and well-supported security concerns.

Finally, Plaintiff contends that the Manuals are relevant to her *Bivens* claims, even though those claims must turn on purported violations of the Constitution rather than internal BOP rules and regulations. Not only does she not bother to articulate that relevance, Plaintiff does not attempt to distinguish *Mercaldo v. Wetzel*, wherein another court in this District denied the production of similar materials, reasoning, as Defendants do here, that the § 1983 claim turned on whether defendants "violated [plaintiff's] rights under the United States Constitution, not

on the Department's own policies." 2016 WL 5851958, at *4 (M.D. Pa.
Oct. 6, 2016) (Carlson, M.J.) (citing *Huertas v. Beard*, No. 10-cv-10,
2012 WL 3096430, at *5 (W.D. Pa. July 30, 2012) ("Whether the
defendants have acted in strict accordance with [the policy] is not at
issue, because we are not concerned with the possible violation of
internal prison policy but rather the alleged violation of plaintiff's
federal constitutional rights, which exist quite independently of any
authorization contained in [the policy].). Consistent with this precedent,
this Court should deny Plaintiff's motion to compel production of
irrelevant and sensitive Manuals.

(Doc. 118, pp. 6-7) (internal footnotes omitted).

Plaintiff seeks to obtain portions of three internal BOP manuals: CIMS
(Central Inmate Monitoring System), chapters 1, 2, 4, 5, 6, 9, 10 & 11; SIS (Special
Investigative Services), chapters 1, 4, 5, 6, 8, 9, 11, 12, and 13; and CSM
(Correctional Services Manual), chapters 1, 4, 5, 6, and Attachment A.

Defendants object to the production of these manuals for three reasons: (a)
they are not relevant to the issue of negligence or violation of Constitutional rights
by government employees; (b) because the manuals are "sensitive" the burden to
produce is overbroad and outweighs the benefit; and, (c) the manuals are protected
by the law enforcement privilege.

        a.    Whether the Procedure Manuals are Relevant to Plaintiff's
                FTCA or *Bivens* Claims

Last year our Eastern District Colleague Judge Rufe set forth the standard of
proof for negligence by corrections officials in a federal prisoner case and described
the "discretionary function exception" to the negligence standard:

> "To prevail under Pennsylvania negligence law, a plaintiff must show a duty, breach of duty, actual loss or harm, and a causal connection between the breach and the harm." The government's duty of care in cases involving federal prisoners is one of ordinary diligence. More specifically, the correctional institution's duty to a federal inmate is "to exercise reasonable care and diligence to protect the prisoner from danger, known to or which might reasonably be apprehended by [the government]."
>
> The FTCA waives sovereign immunity for claims related to injuries "caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment." This waiver, however, does not apply to claims based upon the performance of, or failure to perform, a discretionary function. The government has the burden of proving the applicability of the discretionary function exception. In determining whether the discretionary function exception applies, the Third Circuit has instructed courts to use the two-step *Mitchell* analysis.
>
> At step one, a court must determine whether the act giving rise to the alleged injury involved "an element of judgment or choice." If a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," and the employee did not follow it, the discretionary function exception does not apply because the employee had no choice but to follow the directive. If this is the case, the government is not immune from liability, and the inquiry is complete.

*Bistrian v. Levi*, No. CV 08-3010, 2020 WL 6951048, at *26 (E.D. Pa. Aug. 21, 2020) (internal citations omitted).

By suggesting that the manuals and the policies they announce are "not relevant" Defendants are necessarily taking the position that they will not rely on any of the manuals to establish that the officers conduct was in conformity with the regulations. If a federal corrections employee follows clear policy directives, the

employee does not have a discretionary function and the FTCA waiver of sovereign immunity does not apply. Unless Defendants are willing to unconditionally stipulate that they will <u>not</u> rely on these manuals to establish that the corrections officials acted in conformity with established policy, the manuals are relevant to the negligence issue.

The application of manuals requirements to the conduct of the officers in the *Bivens* context is less clear. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), recognizes an implied cause of action directly under authority of the U.S. Constitution, where there is an absence of any statute specifically conferring the cause of action. In *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), the Supreme Court recognized *Bivens* actions but held that it will now take a more "cautious" approach to each *Bivens* case presented to the Court to determine if the action falls under the previous *Bivens* claims and will not accept a *Bivens* action that is brought in a new context. *See also, Vanderklok v. United States*, 868 F.3d 189 (3d Cir. 2017). Plaintiff has not explained how any of the requested chapters would apply to proof of her *Bivens* claim or a possible defense.

> b.   Whether Plaintiff's Request for Certain Policy Manual Chapters is Overbroad or Burdensome

Plaintiff's counsel was given an opportunity for a confidential review of the manuals in question but was not permitted to make copies. While the requested chapters may not ultimately be used at trial, making copies of a fixed set of materials

is not an overbroad or burdensome request in this context. In addition, these select Manual chapters are subject to the confidentiality agreement and Order (Doc. 43, 44). Defendants have the option to mark these manuals "Confidential" and thereby limit the possibility of public disclosure. The requested portions of these three manuals clearly fall within the definition of "Confidential Information" as defined in paragraph 1 on page 4 of the Confidentiality Order (Doc. 44). Defendants also have the option of marking these manual excerpts as "Prohibited Confidential Information" as defined in paragraph 14 on pages 9-10 of the Confidentiality Order (Doc. 44) providing an additional layer of protection for security sensitive information.

> c.    Whether the Policy Manual Chapters are Subject to Law Enforcement Privilege

In opposing the assertion of privilege Plaintiff argues that Defendants have not "complied with the Third Circuit requirement" to provide an affidavit from the head of the agency stating that he or she has personally reviewed the material, and which provides "a specific designation and description of the documents claimed to be privileged" and "precise and certain reasons for preserving [their confidentiality]." *See United States v. O'Neill*, 619 F.2d 222, 226 (3d Cir. 1980) (*quoting Smith v. Fed. Trade Comm'n,* 403 F. Supp. 1000, 1016 (D. Del. 1975) (emphasis added)). Plaintiff argues that the affidavit of BOP counsel Jonathan Kerr does not satisfy these requirements because he is not the head of the agency and

because the affidavit does not provide precise reasons for preserving the confidentiality of each manual portion Plaintiff seeks.

Without deciding whether the objection and affidavit must come from the agency head I have determined that the affidavit of Attorney Kerr is not persuasive considering the stipulated confidentiality Order (Doc. 44). Defendants' reliance on the well-crafted opinion of Judge Carlson in *Mercaldo v. Wetzel*, No. 1:13-CV-1139, 2016 WL 5851958 (M.D. Pa. Oct. 6, 2016) is distinguishable. In *Mercaldo* the inmate-plaintiff was proceeding *pro se* and still in custody creating immediate security concerns not present here. Accordingly, Defendants are instructed to turn over copies of the requested manual provisions with whatever designation they determine is appropriate under the confidentiality order.

Should Defendants conclude that the stipulated confidentiality order is insufficient to protect the government's legitimate security interests they may file a copy of the specific policies or passages for *in camera* review along with a detailed description of how allowing Plaintiff's counsel to have copies of the policies they have already read would compromise security in the manner described, and by the deadline specified, in Section V of this Opinion.

9.    **Requests for Production #22, 27 & 28 (Inmate violence reports)**

The relevant requests and responses are reproduced below:

**Document Request #22 (Discipline reports for inmate on inmate violence:**

22. Documents related to the disciplinary process for the inmates involved in the inmate-on-inmate violence incident reports already produced. This request includes DHO/UDC reports, DHO/UDC packets, formal statements by inmates, interview documents, evidence, staff reports, hearing testimony, and statements made at DHO/UDC hearings)

The SIS Case files and inmate names are:

| | |
|---|---|
| CAA-14-0060 | Juan Gamez-Salas, Bernard Soto |
| CAA-14-0069 | Wilson Serrano, Juan Gamez-Salas |
| CAA-14-0082 | James McCombs, Oscar Mitchell |
| CAA-14-0092 | Tony Edwards, Jan Stevens |
| CAA-14-0100 | Gerwer Perez-Perez, Jerry Walton |
| CAA-14-0027 | James Cherry, Barry Garcia |
| CAA-14-0029 | Wilson Serrano, Junior Tomlinson |
| CAA-14-0030 | Stephen Berry, Michael Lavoie |
| CAA-14-0033 | Luis Guevera, Christopher Jameson |
| CAA-14-0034 | Leslie Bryant, Markala Moore |
| CAA-14-0048 | Timothy Blalock, Juan Gamez-Salas |
| CAA-14-0052 | Harry Burdick, Rafael Espinoza-Lopez |
| CAA-14-0071 | James McCombs, Christopher Thompson |
| CAA-13-0123 | Laguerre Payan, Lawrence Wallace |
| CAA 13-0126 | Lenny Ramirez-Gomez, German Sanchez-Guzman |
| CAA-13-0132 | Jose Crespo-Jimenez, Rudy Paderez |
| CAA-13-0150 | Juan Gamez-Salas, Juan Ortiz |
| CAA-13-0153 | Marcus Cunningham, Alfredo Delgado |
| CAA-13-0164 | Adrian Cortez-Estrado, Martin Perez-Perez |
| CAA-13-0919 | Juan Gamez-Salas, Raul Santana-Garcia |

**Response:** After concluding a reasonable search, the United States was unable to locate responsive information for CAA-13-0132, CAA-13-

0164, or CAA-14-0100. As for the other incidents, the United States objects to the production of that information as overly broad and irrelevant to the parties' claims or defenses and disproportional to the needs of the case. Responding to the Request would also impose and undue burden.

(Doc. 103-2, pp. 8-10).

### Document Request #27 (Administrative Remedy Requests re: violence involving named Defendants from 2009 to 2014):

27. Administrative Remedy documents filed by inmates about violence in the SHU at USP Canaan for the time period 2009 through 2014 and about any of the named Defendants.

**Response**: By national policy, the Bureau of Prisons preserved administrative remedy case files for only three years. The United States also objects to the production of this information as irrelevant to the parties' claims or defenses and disproportional to the needs of the case. The Request would also require Bureau of Prisons Personnel to invest an overly burdensome amount of time to generate a response.

### Document Request #28 (Form SF-95's re: violence in Canaan SHU):

28. Form SF-95's (and responses and appeals) submitted to the Northeast Regional Office by USP Canaan inmacts [sic] about violence in the SHU at Canaan and about any named defendants in this case, for the time period 2009-2014.

**Response**: The United States objects to the production of this information as irrelevant to the parties' claims or defenses and disproportional to the needs of the case. The Request would also require the Bureau of Prisons personnel to invest an overly burdensome amount of time to generate a response.

(Doc. 103-2, pp. 11-12).

In support of Request #22, Plaintiff argues:

Defendants response- unable to locate responsive documents for three of the twenty incidents and object to the remaining seventeen incidents - "overly broad and irrelevant… disproportional to the needs of the case." Defendants also assert that "responding to the Request would also impose an undue burden." [Ex.P-2 at #22]

*The inmate disciplinary documents are relevant and discoverable.*

An issue in this case is that conduct of BOP staff was a proximate cause of inmate on inmate violence in the SHU and that this longstanding violence was a cause of the subject assault. The information in the requested documents makes it more or less likely that this assertion is true, thus making it relevant and discoverable.

This request seeks the SHU inmates' versions of the assaults, which may be different from BOP staff members' versions in the documents which have been produced. This information also likely includes the reasons underlying the assault, which will not likely be found in any other documents, unless the inmate files an administrative remedy or tort claim (both of which have also been requested).

The BOP disciplinary process reveals why these documents are discoverable. Under that process, inmates are permitted to state their version of the event underlying the incident report that was issued to them by staff. The staff member investigating the incident is required to interview the involved inmates and witnesses and record their statements. [*See* PS 5270.09, Ex.P-6 at 18] The investigator is required to record all actions taken on the incident report and then forward the materials to staff members at the initial disciplinary hearing. [*Id.* at 20] The reverse side of the incident report is where the staff investigator is supposed to include his or her notes about the interviews. [See blank Incident Report, Ex.P-9]

All incidents at issue here involved fights or assaults, which are required to be referred to the Disciplinary Hearing Officer (DHO). [Ex.P-6 at 20] Inmates may make statements and present documents at DHO hearings. [Id. at 29] Witnesses' statements are contained in "investigation materials" presented to the DHO. [*Id.* at 30] After the disciplinary process, a DHO report is issued. [*Id.* at 34] A record of the DHO hearing and documents are kept in the inmate's central file.

Information from the hearing is placed in the SENTRY computer system in the inmate's Chronological Disciplinary Record. [*Id.* at 34] An inmate can appeal a negative finding by the DHO by filing an Administrative remedy (BP-10) to the Regional Director. [*Id.* at 35]

*Defendants should be compelled to produce the documents.*

Defendants' objections are unsupported and should be overruled. First, the request is not overly broad. The first iteration of this request contained a much more expansive time frame – from January 1, 2009 to May 16, 2014. [RPD # 24 to Kaszuba, Ex.P-7 at 7] Over the course of the parties' negotiations, Plaintiff significantly narrowed the time frame to May 1, 2013 to May 16, 2014. Defendants responded partially, by producing some incident-related documents for twenty inmate-on-inmate assaults in the SHU. However, no inmate disciplinary documents were produced, and only the first page of each incident report was produced. Plaintiff has repeatedly followed up, to no avail. [*See, e.g.*, 03/12/19 letter at 3, Ex.P-10]

Defendants' relevance objection is baseless, as the question of whether staff misconduct at USP Canaan played a role in the longstanding inmate violence problems in the SHU is central to the case. The documents produced thus far consist solely of staff members' versions of the stories behind these assaults. Inmates' versions of what occurred in the cell (and beforehand) have not been produced. Disclosure of inmates' statements/versions of these assaults is not "disproportional," it is essential.

Defendants cannot show undue burden, thus their objection is invalid. Plaintiff significantly narrowed the scope of this request to only twenty in-cell violence incidents. Some of the incidents involve the same inmates, which reduces the number of files that need to be searched. The Court should overrule Defendants' objections and order production of requested disciplinary documents, including missing reverse sides of Incident Reports.

(Doc. 98, pp. 13-16) (emphasis in original) (internal footnote omitted).

In support of Requests #27 & 28, Plaintiff argues:

*Administrative Remedies (BP-8, BP-9, BP-10, and BP-11)*

Defendants' response- BOP preserves administrative remedy case files for only three years; objection-irrelevant; disproportional-burdensome. [Ex.P-2 at #27]

*The Administrative Remedy and Tort Claim documents are relevant and discoverable.*

Information contained in inmates' administrative remedy documents (including appeals and responses) is highly relevant to the *Bivens* and the FTCA claims in this case. There are numerous factual issues in dispute regarding how the SHU was operated, how staff treated inmates, and whether staff followed the official BOP policies and procedures with regard to inmate safety and security during this time frame. Defendants have provided some documents containing the official BOP policies and procedures that staff were required to follow. What is wholly missing from the discovery so far is information from the inmates who lived in the SHU during the time period leading up to the assault on Mr. Sayles. The documents sought here are vital to Plaintiff's claims because they contain the inmates' version of what was happening in the SHU and, critically, whether Defendants knew about the inmate violence yet failed to take any steps to stop it. This information is needed to resolve the factual disputes and cannot be supplied through the official BOP policies and procedures or through the depositions of BOP employees. Plaintiff lacks any other means to obtain this information.

In *Beck v. City of Pittsburgh*, 89 F.3d 966, 973 (3d Cir. 1996), the Third Circuit held that prior written complaints regarding the use of excessive force by an individual officer "were sufficient for a reasonable jury to infer that the Chief of Police of Pittsburgh and his department knew, or should have known, of [the officer's] violent behavior in arresting citizens." *Beck* involved *Monell* claims against a municipality based on a longstanding policy and practice of condoning police officers' violence against citizens. Although there is no *Monell* claim in this case, *Beck's* reasoning applies here, Plaintiff alleges that inmates' complaints of prior incidents of inmate-on-inmate violence in the SHU, caused by staff misconduct, provided notice to the BOP of this ongoing problem. This is directly relevant to the causation and proximate cause components of FTCA negligence claims. Defendants asserted a lack of proximate cause as an affirmative defense in their Answer [ECF No. 26

at 4] thereby placing this issue in dispute and making this information relevant and discoverable. This information is also relevant to the Eighth Amendment failure to protect and failure to intervene claims against the individual *Bivens* defendants, because it makes it more or less likely that these defendants knew of the substantial risk of serious harm posed to Mr. Sayles in the SHU. *See Farmer*, 511 U.S. at 834 (evidence relating the prevalence of violence could show knowledge on the part of prison defendants about the risk of harm to inmates). To the extent the administrative remedies include complaints about any of the named Defendants, this information is relevant to the FTCA intentional infliction of emotional distress claims against the United States.

The administrative remedy information is discoverable because it would lead to the identification of potential witnesses with relevant information about the problem of inmate violence in the SHU.

*Defendants should be compelled to produce these documents.*

Plaintiff's request for administrative remedy documents has been wrongly obstructed by Defendants. Plaintiff first requested these documents on November 22, 2017 at RPD #27 directed to Defendant Ebbert. Defendants first responded that they had provided Donshay Sayles' complete file and that any administrative remedies he had filed would be in that file. [Ex.P-11 at 2] After Plaintiff followed up on this, explaining that this request does not seek administrative remedies in Mr. Sayles' file and that the administrative remedies sought are relevant to the allegations that the assault on Mr. Sayles stemmed from the longstanding problem of SHU violence at Canaan [*Id.* at "Plaintiff's Reply"], Defendants asserted that Administrative remedies cannot be sorted according to subject matter but are, instead only organized according to the inmate's name. [*Id.* at "Defendants' Additional Response"]

Plaintiff's counsel then located information indicating that the BOP can and does keep track of administrative remedies by topic. For example, Program Statement 1330.018 (Administrative Remedies) refers to both "abstracts" and "subject codes" for administrative remedies which are to be input into the BOP's computer system, known as "SENTRY." [*See* PS 1330.018, p.3 Section 5a.(6), Ex.P-12] The Program Statement also provides that the "abstract" description of the issue raised in the

administrative remedy "shall be taken from the response's first paragraph" and "abbreviations may be liberally used, as long as they are easily understood, to allow as complete a *description of the issue* in the 50 characters allotted." *[Id.* at pp. 10-11 "Index Completion" (emphasis added)]

Plaintiff then reasserted this request on March 12, 2019 and asked for a retention schedule for Administrative remedies. [Ex.P-10 at 5] In May 2019, Defendants produced a retention schedule which provides that these documents are to be retained until three full years after the administrative remedy response is completed. [*See* Ex.P13 at 1 (retention schedule)] The Retention Schedule also provides that Administrative Remedies Indexes are to be maintained in a computer-accessible form for 20 years, then destroyed. [*See id.*] The Administrative Remedy Program Statement provides that Indexes and Responses are to be made available to the public. [Ex.P-12, PS 1330.018 at p. 11, Section 14]

On August 2, 2019, Plaintiff's counsel again followed up on the request for administrative remedies, seeking an index and other information which would enable Plaintiff to determine whether any responsive documents may still be in existence. [*See* Ex.P-14]

Defendants have not produced the requested index or any other information which would help determine if any responsive documents exist. Instead, in their January 24, 2020 response, Defendants revert to the statement that "Administrative Remedy case files are preserved for three years." [Ex.P-2 at #27] Plaintiffs do not dispute that this is the general BOP policy. However, at this stage of the discovery wrangling over administrative remedies, the issue is whether any responsive administrative remedy files are still in existence – given that the original request sought administrative remedies for the time period 2009 to 2014 and the BOP policy requires that the case files be preserved for a full three years after the final response is issued. [Ex.P-13 (retention schedule)] The length of time for a final response to be issued, after the administrative remedy program's three levels have been completed, could vary considerably. For example, if an inmate file an administrative remedy about SHU violence at Canaan on January 1, 2013 and a final response was not issued by the BOP until January 1, 2016, then under BOP policy, the administrative remedy case file

would be required to be preserved for a full three years - until January 1, 2019.

Plaintiff submits that a five-year period of time is not unduly burdensome and is in line with the general temporal limits established for discovery in this Circuit. *See Fassett*, 319 F.R.D. at 157 (noting that courts in the Third Circuit have applied "a default position of limiting discovery to no earlier than five years from the date on which the allegedly tortious conduct occurred") (citations omitted).

In light of the relevance of the administrative remedies to Plaintiff's claims and Defendants' ongoing and baseless resistance to producing them, Plaintiff asks the Court to order the production of these documents.

The information sought in this request is highly relevant to both the *Bivens* and FTCA claims and defenses in this case, as ongoing inmate-on-inmate violence in the SHU is alleged to have been a cause of the assault on Mr. Sayles.

(Doc. 98, pp. 21-26) (emphasis in original) (internal footnotes omitted).

Defendants address Item #22 at two parts of their Brief. They reported that documents related to the following three SIS case files could not be located: CAA-13-0132, Jose Crespo-Jimenez, Rudy Paderez; CAA-14-0100, Gerwer Perez-Perez, Jerry Walton; and CAA-13-0164, Adrian Cortez-Estrado, Martin Perez-Perez. In support of their position, Defendants submitted a declaration, which states in relevant part that:

a.    there is no RIDS policy specific to DHO Reports. A record copy of the DHO report is to be stored in the respective inmate's Central File maintained at the current or last institution or facility of confinement, and archived once an inmate releases from their federal term and the supervised release term expires. While not required, often Discipline Hearing Officers maintain their own

DHO report files at the institution. The identified, requested, SIS investigative report file numbers were cross-referenced with each of the involved inmate's discipline history in order to locate a searched Incident Report Number and date. USP CAA DHO files were searched by a government official and all requested reports were located and produced except as noted below:

i.    CAA-13-0132: Jose Crespo-Jimenez, Rudy Paderez. There is no related sustained discipline for either inmate associated with this Case File Number. Thus, there is no responsive DHO report.

ii.   CAA-14-0100: Gerwer Perez-Perez, Jerry Walton: Gerwer Perez-Pacheco (correct name), Reg. No. 41280-080, received sustained discipline from Incident Report Number 2580048 (5/6/14 incident; 5/29/14 hearing date). DHO records at USP CAA were searched by a government official and the file did not contain the DHO report. On August 14, 2019, Perez-Pacheco released from Big Spring Correctional Center, a GEO Group private contractor-owned and operated facility.

iii.  CAA-13-0164: Adrian Cortez-Estrado, Martin Perez-Perez. Martin Perez-Perez, Reg. No. 20713-031; IR 2479577 (8/13/13 incident; 8/22/13 hearing date). DHO records at USP CAA were searched by a government official and the file did not contain the DHO report. On August 29, 2014, Perez-Perez was a full term release from USP Canaan and his supervised release term expired three years later in 2017.

(Doc. 110-2, p. 15).

In response to requests for production 27 & 28, as well as related request #22 (for DHO records from 17 incident of inmate-on-inmate violence) Defendants argue that the requests are "disproportional," would impose an undue burden, are not relevant to Plaintiff's FTCA claims, and are not relevant to Plaintiff's *Bivens* claims.

On the issue of the disproportionality of the requests, Defendants argue:

> Through Items 22, 27, and 28, Plaintiff seeks all inmate allegations, statements, complaints, or claims regarding prior incidents of inmate-on-inmate violence in the SHU over the course of years. Most saliently, Plaintiff requests all such complaints by any inmate at Canaan. Also discoverable, according to Plaintiff, are prior allegations of misconduct regarding the individual Defendants. These requests also are for all complaints over the course of years from all inmates at Canaan. Not only would the burden of such a production on the Defendants be disproportional to the needs of the case, but such allegations have no bearing on either the FTCA or the Bivens claims.

(Doc. 110, p. 6).

On the issue of undue burden, Defendants argue:

> Plaintiff's requests are, indeed, quite burdensome. To demonstrate, the Defendants have supplied the Court a declaration from Jonathan Kerr, counsel for the Bureau of Prisons ("Kerr Dec."), explaining the steps the BOP would have to undertake to respond to these requests. Regarding the requested "administrative remedies," Mr. Kerr explains that, because the actual remedy forms are stored in hard copy rather than electronic form, it is impossible for the BOP to retrieve the requested documents through a simple electronic query. Kerr Dec. ¶12. Moreover, the administrative remedy forms are not organized by topic (i.e., inmate-on-inmate violence), but rather by remedy ID Number. *Id.*
>
> Given these circumstances, if the BOP were ordered to make this production, it would first have to query an electronic index of administrative remedies. This index does not contain the actual remedy forms, but it does incorporate certain codes that the BOP could use to cull the potential universe. *Id.* ¶4, 13. The codes are not sufficiently specific for the BOP to search for "inmate on inmate" violence, or the like. *Id.* Nor is the index searchable by individual Defendant name. *Id.* The most specific queries the BOP can perform are for all claims regarding the SHU and all claims of alleged staff misconduct (i.e., not particular to the individual Defendants). *Id.* Each item returned would then have a 50 character maximum description of the nature of the claim.

The BOP conducted that index search for administrative remedies at Canaan between 2009 and 2014 concerning the SHU and alleged staff misconduct, resulting in 696 hits. *Id.* ¶¶14-16. For each of those hits, the BOP would then have to secure the inmate's file, manually search it, and scan the relevant contents. Mr. Kerr estimates that it would take 15 minutes to review each inmate file. *Id.* ¶16. Multiplied by the universe of 696 hits from the index, ***it would take 174 hours just to do the manual review of the inmate files***. *Id.* This estimate is for the administrative remedies search only.

Regardless, Plaintiff is far from the first to seek production of prior, unrelated inmate allegations and complaints, and courts in this District routinely refuse such requests as overbroad, irrelevant, unreasonably burdensome, and seeking to elicit private information. In *Mercaldo v. Wetzel*, 2016 WL 5851958 (M.D. Pa. Oct. 6, 2016), for example, Magistrate Judge Carlson denied a discovery request seeking "any and all grievances . . . concerning the treatment of inmates by defendants[.]" As the court explained, "[t]hese are precisely the kinds of sweeping, generalized and overly broad discovery requests judges in the Middle District of Pennsylvania have rejected as not only overly broad, but unduly infringing upon the privacy interests of other inmates who may have sought to grieve unrelated issues they had with staff." *Id.* at *4.

The outcome in *Mercaldo* is more the rule than the exception. In *Montanez v. Tritt*, 2016 WL 3035310, at *4 (M.D. Pa. May 26, 2016), District Judge Mariani denied as "overly broad, irrelevant, confidential, bear[ing] no sufficient connection to the case, and rais[ing] obvious privacy and security issues" a document request seeking "[a]ll incident reports that evidence, mention, or refer to incident of inmate on-inmate assault [sic] since May 29, 2009." In *Lofton v. Wetzel*, 2015 WL 5761918, at *2 (M.D. Pa. Sept. 29, 2015), Chief District Judge Conner dismissed as a "grossly overstated fishing expedition" a discovery request seeking "all incident reports" regarding staff assaults on inmates. Over and over again, courts in this District deny the very sort of discovery that Plaintiff seeks here. *See, e.g., McDowell v. Litz*, 2009 WL 2058712, at *2 (M.D. Pa. July 10, 2009) (Rambo, J.) (denying as "overbroad and overly burdensome" and on privacy grounds an inmate's request for "any and all grievances, complaints or other documents . . . concerning harassment, and or mistreatment of inmates' visitors . . . during the years of 2006 up until 2008[.]"); *Torrez v. Clark*,

2011 WL 4898168, at *2-3 (M.D. Pa. Oct. 13, 2011) (similar); *Callaham v. Mataloni*, 2009 WL 1363368, at *3-4 (M.D. Pa. May 14, 2009) (similar). This Court should do the same, as imposing this burden on the Defendants is disproportional to the needs of the case not only because of the amount of time it would take to comply, but also because, as explained immediately below, the materials are not relevant to Plaintiff's claims.

(Doc. 110, pp. 7-9).

Defendants also argue that requests for production 22, 27, and 28 are not relevant to the FTCA claims because:

> Plaintiff cites *no authority* for the proposition that a defendant's acts or omissions in unrelated, prior incidents (negligent or not) can be probative of whether a defendant was negligent in a subsequent case. While courts routinely consider prior incidents in the contexts of employment law (e.g., comparators), and even in products liability torts where evidence of prior, unrelated injuries can put a manufacturer on notice of a defect (*see, e.g., Medina ex rel. Betata v. Rose Art Indus., Inc.*, 2003 WL 1877563 (E.D. Pa. Feb. 28, 2003)), the United States is unaware of analogous authority in the negligence context.
>
> Plaintiff's FTCA claims turn on whether the United States was negligent for celling Wing with Sayles and for intervening in the altercation in the manner it did. The Complaint's allegations reveal that Plaintiff understands she will have to prove those negligence claims based on what Defendants knew about Sayles and Wing, not on what they knew about prior incidents involving neither inmate. Specifically, when pleading her negligence claim under the FTCA for celling Wing with Sayles (Count VI), Plaintiff alleges not that Defendants knew of and failed to correct a rampant culture of violence in the SHU, but that Defendants were privy to the following "facts" that should have made the resulting altercation foreseeable:
>
>   • Sayles needed protective custody because of his refusal to participate in a group melee while incarcerated at Big Sandy (Compl. ¶170);

- Wing had attacked African American inmates in the recent past (*Id.* ¶172);

- Sayles was susceptible to attack from inmates generally for being a "check in" and from Wing in particular because he is African American (*Id.* ¶171);

- Sayles was at risk of attack because Wing had known violent propensities (*Id.* ¶173); and,

- Defendants celled Wing with Sayles without conducting a thorough investigation into the backgrounds of both inmates (*Id.* ¶175).

Consistent with these allegations, the United States concedes that prior incidents and allegations involving either Wing or Sayles should be discoverable, as such events could impact the foreseeability of the harm that eventually befell Sayles after the BOP celled him with Wing. To that end, the United States has already produced all disciplinary history for Wing and all materials regarding the Complaint's effort to link Sayles' experience at U.S. Penitentiary Big Sandy with his eventual injury at Canaan. See Compl. ¶¶ 32, 42-46 (allegations regarding Big Sandy events and their purported relevance to this case).

Plaintiff's outstanding requests differ in that they seek information about incidents involving *neither* Wing nor Sayles. But it is irrelevant to Plaintiff's claims whether the BOP was (or was not) negligent in failing to prevent a prior inmate altercation. Also irrelevant are allegations made by an unrelated inmate against any of the individual Defendants. What matters instead is whether the BOP was (or was not) negligent in failing to prevent the particular altercation at issue here – the one between Wing and Sayles. Unrelated allegations of misconduct do not make it any more or less probable that the United States was negligent for celling Wing with Sayles or for intervening in the altercation in the manner it did, and Plaintiff cites no authority stating otherwise.

*Beck v. City of Pittsburgh*, 89 F.3d 966, 973 (3d Cir. 1996), cited by Plaintiff on this issue, actually supports the United States' argument. While *Beck* ruled that prior, unrelated incidents of police misconduct were probative of the *claim at issue*, the court reached that conclusion

partly "[b]ecause Beck's claim is *not based on ordinary negligence or tort principles* but on a federal civil rights statute[.]" *Id.* at 971 (emphasis added). *Beck* involved a §1983 claim against a municipality. The Third Circuit explained that, "[w]hen a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." *Id.* It is no surprise, therefore, that "prior incidents" were discoverable in that context. But Plaintiff has not alleged – and could not allege – a § 1983 action against the United States. As much as Plaintiff may wish to put five years of events at USP Canaan on trial, the claims she filed do not permit her to do that.

Finally, even if the law permitted Plaintiff to rely on unrelated instances of inmate-alleged misconduct, it would not be as simple as pointing to the mere existence of prior alleged misconduct and asking the factfinder to infer negligence against Sayles. Plaintiff implicitly acknowledges this by rationalizing her request with a desire to learn about "*the inmates' version* of what was happening in the SHU[.]" Motion at 18 (emphasis added). But an inmate's "version," by definition, would be of untested veracity and unknown reliability, requiring this Court to oversee a "mini" trial for each set of allegations. Doing so would also unfairly burden the Defendants, who would have to do their own discovery on each incident, including depositions of all inmates and BOP staff implicated by each set of allegations.

(Doc. 110, pp. 10-14) (internal footnotes omitted).

Defendants then argue that requests for production 22, 27, and 28 are not

relevant to the *Bivens* claims because:

Plaintiff cites the Supreme Court's ruling in *Farmer v. Brennan*, 511 U.S. 825 (1994), when arguing that unrelated inmate allegations are probative of her Bivens claims because it makes it "more or less likely that these defendants knew of the substantial risk of serious harm posed to Mr. Sayles in the SHU." Motion at 19. But the standards formed in *Farmer* actually weigh *against* the production of this information, as the Court explicitly rejected a constructive notice standard in favor of actual notice for deliberate indifference. That is, in order to prevail, it

is not enough for a plaintiff to prove that defendants were on constructive notice of a substantial risk of harm and failed to take reasonable precautions. It irrelevant, therefore, if Plaintiff can point to a history of prior alleged inmate assaults to show that Defendants *should have known* about an increased risk to Sayles. 511 U.S. at 837-38. Instead, Plaintiff must prove that the Defendants *actually knew* (1) of that history, (2) that such history put Sayles at substantial risk, and (3) that they failed to take reasonable precautionary measures.

The Court in *Farmer* did acknowledge that a "well-documented" history of inmate attacks *could* impart actual knowledge of a danger, but only where "the defendant-official being sued had been exposed to information concerning the risk." *Id.* at 842. Critically, the defendants in *Farmer* were high-level BOP officials who would have access to such information. *Id.* at 830 (Two wardens, the Director of the BOP, the Director of the BOP North Central Region Official and a Regional Office Case Manager). Plaintiff here also originally sought liability against high-ranking BOP officials ("Supervisor Defendants") and had similarly argued that those individuals, who had no personal involvement in choosing to cell Wing with Sayles, were liable because they were privy to but failed to ameliorate systemic issues with violence. But because those Supervisor Defendants are no longer party to this suit, Plaintiff cannot point to an evidentiary burden she no longer has to justify a document request she continues to press in their absence. Even if the Supervisor Defendants were still party to this suit, in order to determine whether these prior complaints were sufficiently credible to put them on "actual" notice, the parties and the Court – as with the negligence claims – still would have to investigate and engage in a "mini" trial for each one.

Plaintiff also requests all complaints accusing the individual Defendants of wrongdoing, but these materials would be irrelevant because allegations are just that – allegations. As with the allegations concerning inmate violence, for each complaint against an individual Defendant, the parties and the Court would have to launch a separate fact finding mission to test veracity and relevance. When considering that burden along with the fact that (1) the BOP is unable to conduct searches of the administrative remedies by individual Defendant's name, but instead would have to do a manual paper search, and that (2) as outline in Section I.A., above, courts in this District routinely deny

requests just like Plaintiff's, this Court should not order the Defendants to produce these materials.

(Doc. 110, pp. 14-16) (internal footnotes omitted).

In her Reply Brief, Plaintiff argues:

Defendants characterize Plaintiff's FTCA claims as being based on the negligence of the United States in celling Wing and Sayles together and for "intervening in the altercation in the manner it did." *See* Def. Br. at 6. Defendants again refuse to acknowledge that one of the bases for the FTCA claims is the longstanding and pervasive problem of inmate violence in the SHU caused by staff misconduct. *See* Am. Compl., ECF No. 23 at ¶¶ 114-117 (alleging that the attack on Mr. Sayles was brought about by staff misconduct and that this was a pattern at Canaan); ¶ 139 (". . . despite their knowledge of the systemic inmate-on-inmate violence in the SHU at USP Canaan and their knowledge of SHU staff's direct or indirect involvement … Samuels, Norwood, Ebbert, and Kaszuba failed to monitor, supervise, train, investigate and discipline SHU staff … to meaningfully address this problem..."); ¶ 162 (re-alleging and incorporating by reference the allegations of paragraphs 1-161); ¶¶ 163-168 (alleging the duties of correctional officers and other prison officials to protect inmates from harm from other inmates, to house inmates in a safe and secure manner, to protect inmates from known and obvious dangers posed by other inmates, to conduct thorough investigations of inmates' backgrounds to provide for safe housing of inmates); and ¶ 169 (alleging that BOP supervisory officials have a duty to monitor, supervise, train, and discipline correctional staff in order to ensure that they carry out their duties so that inmates are safely housed and their constitutional rights are not violated).

Contrary to Defendants' argument (Def. Br. 6-7), even though the constitutional claims against Defendants Samuels, Norwood, Ebbert, and Kaszuba have been dismissed, the allegations setting forth these individuals' acts and omissions support the FTCA negligence claims, because they were BOP employees acting within the course and scope of their employment. These allegations are expressly incorporated into Count VI.

Contrary to Defendants' assertion (Def. Br. at 6), prior incidents are regularly considered in Pennsylvania negligence cases to demonstrate that the tortfeasor had notice that the conditions posed a risk of harm to the plaintiff which was reasonably foreseeable. *See, e.g., Mistecka v. Commonwealth*, 408 A.2d 159 (Pa. Commw. 1979) (26 prior instances of rock throwing from a bridge created a reasonably foreseeable risk of harm); *Pearson v. Phila. Eagles, LLC*, 220 A.3d 1154 (Pa. Super. Oct. 11, 2019) (lack of prior instances of assaults meant that the attack on plaintiff was not reasonably foreseeable); *Manson v. SEPTA*, 767 A.2d 1 (Pa. Commw. 2000) (record contained no evidence of prior incidents of dangerous ladder use which would support a finding of reasonably foreseeable risk of harm to plaintiff). Here, evidence of past incidents of inmate violence in the SHU caused by staff misconduct, and BOP employees' failure to address the staff misconduct, are not "unrelated" to this case as Defendants assert but play a central role in determining *the foreseeability of the harm* suffered by Mr. Sayles. *See Reilly v. Tiergarten*, 633 A.2d 208, 210 (Pa. Super. 1993) ("A court must determine whether an ordinary person would foresee that an injury would be a natural, probable outcome of the act complained of.")

Past incidents of SHU violence are also relevant to the remaining *Bivens* claims. Defendants assert that past incidents of inmate violence cannot be relevant to the deliberate indifference analysis for the remaining *Bivens* claims, because the remaining individual defendants are not "high ranking supervisors" and would therefore not have access to such information. (Def. Br. at 10-11) However, it remains to be seen whether any of the remaining *Bivens* defendants knew about the ongoing inmate violence in the SHU. Given that several of the remaining individual defendants were directly involved either in SHU Operations (Defendants Sudul, Gonzalez, Hagemeyer) or the operation of the SIS Department, which was charged with investigating the incidents of inmate violence in the SHU (Defendants Gintz, Pedone, Vizcaino), it would seem likely that they would have access to this information. At any rate, Plaintiff is not required to prove the merits of her *Bivens* claims at this stage in the proceedings and Defendants' speculation as to what may be able to be proven at trial is not a valid reason to deny Plaintiff access to this information during the discovery phase.

*Discovery of facts pertaining to past SHU violence will not require "mini trials" any more than the disclosure of any other information.*

Defendants' argument regarding "mini trials" (Def. Br. 9, 11) seeks to undermine the purpose of discovery by pre-judging facts that Plaintiff has not yet obtained. It is not Defendants' prerogative to assess and evaluate the facts; this is the fact finder's function. Obtaining and evaluating facts derived from other inmates and incidents would no more require a "mini trial" than would obtaining facts from any other source. The evidentiary value of this information is no different, on its face, than that of the documents and testimony of prison staff. Following Defendants' argument to its logical conclusion, no declarations, affidavits, reports or other BOP-generated documents should be obtained by any party through discovery because the assertions made within those documents would require a "mini trial." Such a result would be absurd.

*The denial of motions to compel in other cases is not a valid reason to deny Plaintiff's motion to compel.*

Defendants' argument at [Def. Br. at 4-5] should be rejected for several reasons. First, it is unknown whether the *pro se* complaints in the cases cited by Defendants included allegations which attribute the harm that befell the plaintiff to the ongoing violence in the SHU and prison officials' knowledge of that substantial risk of harm. None of the opinions cited by Defendants discuss the reasons that the prior administrative remedies were sought or how the information in those remedies tied in with the *pro se* plaintiffs' claims or theories of liability. Here, by contrast, the administrative remedy and incident-related information sought plays a key role in proving elements of Plaintiff's claims. Second, one of the main reasons given by the courts for denying the motions to compel appear to be "security reasons" stemming from an unarticulated concern with how information might be able to be used outside of litigation purposes by the pro se incarcerated plaintiff. Privacy concerns of other inmates also appear to have played a role in these rulings, given that inmates' personal information may be included in the documents. [Def. Br. at 5] These concerns are not at issue here, as Mr. Sayles is no longer in prison and, apart from that, has been rendered completely incapacitated from the attack. Moreover, a protective order is in place to limit the use of any information which is

legitimately considered to trigger security or privacy concerns. Finally, using other courts' denials of motions to compel would violate Rule 26's directive that the scope of discovery be evaluated with regard to "the needs of the case" and with reference to the pleadings filed in this case – not based on the pleadings in other cases. See, e.g., *Trask v Olin Corp.*, 298 F.R.D. 244, 263 (W.D. Pa. 2014).

*The Need for the Information About past incidents of SHU Violence Outweighs the Burden.*

Plaintiffs have repeatedly requested administrative remedy documents and were told that remedies were organized by the inmate's name or registration number and could not be searched according to topic. Despite being asked for the administrative remedy indexes, which Plaintiff's counsel learned about through independent investigation, no indexes were produced. Now, when faced with Plaintiff's motion to compel, Defendants admit in exhibits prepared by Jonathon Kerr, a BOP attorney, that indexes can be searched and that such a search can, indeed, be done according to topics and sub-topics called subject codes. [See First Decl. Of Jonathan Kerr, ECF No. 110-2 at 5-6] Plaintiff also learned that a 50-word description of the administrative remedy is included in the index. [*See id.*] And, finally, Defendants relate that they have in fact reviewed the indexes, conducted several searches, and identified a significant number of remedies which would be responsive. [*See id.*; Def. Br. at 4]

Nonetheless, Defendants now claim that it would require too much effort and time for them to conduct this review and produce the requested documents. [*See* Def. Br. at 4] After over two years of repeatedly following up and attempting to overcome Defendants' stonewall, Plaintiff finds this excuse exceedingly lacking. Indeed, if Defendants had provided the subject matter list and the remedy indexes earlier in this case, much of this work could already have been done. At this point, Defendants have not even produced the remedy indexes, which are supposed to be publicly available.

The volume of information obtained through Defendants' remedy index search weighs in favor of producing this this information, not against it. Plaintiff's counsel is willing and able to perform the review of these documents and estimates that the time it would take to complete this

review may not even approach the time and effort Plaintiff has already expended in reaching this point. Similarly, Plaintiff is entitled to review the 23 tort claim files identified through Defendants' search [*See* First Kerr Decl., ECF No. 110-2 at 6-7, # 19], as well as any additional files located by searching under the "failure to supervise" and "failure to train" case sub-type labels which were not included as parameters of the search already conducted. [*See id*. at # 18] Finally, as discussed in Plaintiff's opening brief, Plaintiff is entitled to review the disciplinary documents for the inmates involved in the 20 SHU assaults previously identified by Defendants in discovery.

(Doc. 117, pp. 4-10) (emphasis in original) (internal footnotes omitted).

In their Sur-Reply, Defendants argue:

It is irrelevant to this case whether the Defendants were (or were not) negligent in failing to prevent prior inmate altercations, so there is no need for the Defendants to undertake the herculean effort to search for and produce these materials. *See* First Declaration of Jonathan Kerr, at ¶¶ 12-16 (Dkt. No. 110-2). Plaintiff cites to three cases that, she contends, support the relevancy and discoverability of these incidents. *See, e.g., Mistecka v. Commonwealth*, 408 A.2d 159 (Pa. Commw. 1979); *Pearson v. Phila. Eagles, LLC*, 220 A.3d 1154 (Pa. Super. 2019); *Manson v. SEPTA*, 767 A.2d 1 (Pa. Commw. 2000). These cases are inapposite, as they establish only that prior, unrelated incidents can prove that a ***defendant was on notice of a particular hazardous condition***, which notice created an otherwise nonexistent duty on that defendant to take reasonable precautionary measures to prevent a recurrence. Defendants do not contest this point of law, but it does not respond to the substance of their objection.

It is undisputed that the factual cause of Mr. Sayles's injuries was an inmate-on-inmate attack in the Special Housing Unit of a federal prison. It is likewise undisputed that the threat of physical altercations between inmates is a known hazard in that setting and that the United States owes federal inmates a duty of care. Because these issues are undisputed, there is no need to investigate whether prior incidents put the United States on notice of a hazardous condition sufficient to create a duty.

What *is* disputed, however, is whether Defendants' misconduct was the proximate cause of Mr. Sayles' injuries. The cases cited by Plaintiff do *not* hold that a defendant's conduct in a *prior* incident is probative of whether a defendant caused an injury in a *subsequent* incident. Yet, Plaintiff insists that, if she can prove that the Defendants were negligent in failing to prevent prior incidents, it would suggest that they were negligent here. The law does not allow a factfinder to infer negligence from prior negligent conduct, but even if it did, it *would* require this Court and parties first to embark on a "mini trial" to determine whether Defendants actually were negligent in those prior incidents.

Plaintiff's Reply creates – and then knocks down – a strawman by arguing that, if pushed to its logical conclusion, Defendants' argument is that "no declarations, affidavits, reports or other BOP-generated documents should be obtained by any party through discovery because the assertions made within those documents would require a mini trial." Dkt. No 117 at 8. Defendants make no such argument. Declarations, affidavits, and other evidence are distinguishable because the factfinder would weigh that evidence as part of the process of determining fault in *that* incident, not fault in a *different* incident that occurred at a *different* time, concerning *different* actors, under *different* circumstances. This is why Plaintiff's contemplated use of these prior incidents – to determine whether they were "caused by staff misconduct" – would take both the parties and this Court on an incident-by-incident frolic and detour.

Perhaps most critically, courts in this District overwhelmingly deny discovery of this exact variety on this exact basis. *See Mercaldo v. Wetzel*, 2016 WL 5851958, at *4 (M.D. Pa. Oct. 6, 2016) (denying a discovery request seeking "any and all grievances . . . concerning the treatment of inmates by defendants . . . [as] precisely the kinds of sweeping, generalized and overly broad discovery requests judges in the Middle District of Pennsylvania have rejected as not only overly broad, but unduly infringing upon the privacy interests of other inmates who may have sought to grieve unrelated issues they had with staff"); *Montanez v. Tritt*, 2016 WL 3035310, at *4 (M.D. Pa. May 26, 2016) (denying a discovery request seeking "[a]ll incident reports that evidence, mention, or refer to incident of inmate-on-inmate assault [sic] since May 29, 2009"); *Lofton v. Wetzel*, 2015 WL 5761918, at *2 (M.D. Pa. Sept. 29, 2015) (dismissing as a "grossly overstated fishing

expedition" a discovery request seeking "all incident reports" regarding staff assaults on inmates); *McDowell v. Litz*, 2009 WL 2058712, at *2 (M.D. Pa. July 10, 2009) (denying a request for "any and all grievances, complaints or other documents . . . concerning harassment, and or mistreatment of inmates' visitors" over a two-year period); *Torrez v. Clark*, 2011 WL 4898168, at *2-3 (M.D. Pa. Oct. 13, 2011) (similar); *Callaham v. Mataloni*, 2009 WL 1363368, at *3-4 (M.D. Pa. May 14, 2009) (similar).

Plaintiff provides no legal authority to the contrary and, instead, attempts to distinguish these sound holdings by noting the plaintiffs were pro se. This argument warrants quick dismissal: discovery is either appropriate or it is not; the scope of discovery does not turn on the representation status of the propounding party. Consistent with the wealth of Middle District of Pennsylvania case law on these generalized, sweeping requests, the Court should deny Plaintiff's request for this information.

(Doc. 118, pp. 2-5) (internal footnotes omitted).

Regarding these three unique classes of documents both briefs co-mingle their arguments in a way that makes it difficult if not impossible for me to sort out the competing claims. Although I am reluctant to make the parties redo their work, here I must. Plaintiff's Brief addresses "Item 22" (the twenty separate incidents involving inmate on inmate violence) on pp. 9-12 of her brief, (Doc. 98). She then lumps "Item #27" (Inmate violence reports involving the named Defendants, but not involving Sayles or Wing) and "Item 28" (Inmate violence documents in Canaan SHU from 2009-2014) in pp. 17-22 of her brief. Defendants' respond in their brief (Doc. 110) at pp. 3-12 by lumping the three types of documents together and then adding a

fifteen-page declaration by Attorney Kerr (Doc. 110-2, Ex. A) and an eight-page declaration by Attorney Kerr (Doc. 110-2, Ex. B).

I recognize that both lawyers are acting in good faith to protect their clients' interests and that the issues here are voluminous, complex, and important. In order for the Court to give these three unique classes of documents the attention they each deserve a new motion and new briefs must be filed.  Plaintiff should file a new motion and brief with separate sections on each of the three items (#22, 27, & 28) describing with particularity what precisely she seeks and why it is discoverable. Defendants' should then respond with a brief addressing each section of Plaintiff's brief separately.  Plaintiff's motion, brief, and supporting exhibits are due on the date specified in Section V of this Opinion.

No other motions or briefs addressing any discovery issues beyond Request for Production # 22, 27, and 28 will be expected without specific leave of court.

### 10.    Request for Production #29 (Defendants' personnel files)

The relevant request and response are reproduced below:

29. All documents from each named Defendant's BOP personnel file containing disciplinary information (including allegations of misconduct and any investigations into such allegations, whether or not the allegations are substantiated) and performance evaluations.

**Response**: Searches conducted by the Bureau of Prisons following the parties' Joint Disclosure Statement dated March 21, 2019, have uncovered additional instances of sustained discipline against some of the individual defendants in this case, none of which concern Mr. Sayles or Mr. Wing. Nevertheless, the production of that discipline or

any other materials responsive to this Request is objectionable because they are irrelevant to whether the United States was negligent or whether any of the individual defendants violated the constitutional rights of Mr. Sayles. Moreover, due to the extreme sensitive nature of the inquiry and the Request's failure to incorporate temporal or topical limits, the requested production would be disproportional to the needs of the case and impose a burden that outweighs any benefit.

(Doc. 103-2, pp. 12-13).

Plaintiff argues:

Defendants' response- objection- irrelevance; disproportional to the needs of the case; burdensome. [Ex.P-2 at #29] Defendants also assert that information relating to sustained disciplinary action against some of the Defendants does not "concern" either Mr. Sayles or Joseph Wing.

*Employees' disciplinary information is relevant and discoverable.*

This case is about an incident that could not have happened without BOP staff's involvement. Plaintiff asserts that assaults like the one carried out on Mr. Sayles had occurred in the past, due to BOP staff's conduct in putting a violent inmate into another inmate's cell. [ECF No. 23, Am. Compl. ¶¶ 114, 115] The Amended Complaint further alleges that BOP officials both inside and outside of USP Canaan knew about these previous attacks and knew about the role played by staff members in causing them. [*Id.* ¶¶ 116-118] Plaintiff further alleges that despite having this knowledge, BOP officials failed to take any meaningful action to address this problem, thereby resulting in the attack on Mr. Sayles. [*Id.* ¶¶ 123-125] Defendants denied each of these allegations. [ECF No. 26, ¶¶ 114-118, 123-125] Therefore, the pleadings demonstrate that these issues are "fact[s] of consequence to the determination of the action" and any evidence which has "any tendency" to make them "more or less probable" is relevant. *See* Fed. R. Evid. 401.

The disciplinary information in the personnel files is relevant. First, allegations of staff misconduct must be investigated. [*See* PS 1210.24, generally, attached as Ex.P-15] If the allegations are proven to be true and the employee is subject to discipline, this information would be

transmitted to BOP officials responsible for supervising, monitoring, and disciplining staff. [*See id.*] This information is relevant because it pertains to the causation (and proximate cause) elements of Plaintiff's negligence claims, because Plaintiff alleges that the United States knew about longstanding staff misconduct leading to inmate violence in the SHU yet failed to do anything about it and that it was this failure which caused the assault on Plaintiff. Past instances of officer misconduct which relate to inmates' safety or security has a direct bearing on the foreseeability of risk of harm posed to inmates such as Mr. Sayles. "There can be no question of the relevancy of [police personnel files] to the allegations of the complaint, particularly where [the complaint] specifically alleges the inadequacy of the [municipality's] supervising and training of [defendant police officer]." *Scouler v. Craig*, 116 F.R.D. 494, 496 (D. N.J. 1987).

Even if the misconduct allegations in BOP staff's disciplinary records do not pertain directly to the SHU or to violence, they may still be relevant if they relate to employees' failures to perform their duties. *See Smith v. Donate*, M.D. Pa. Civ. No. 10- cv-2133, Mem. Order (June 7, 2012) (Rambo, J., Carlson, MJ) (conducting in-camera review and then ordering production of documents in personnel files related to "infractions for failure to report use of excessive force, misconduct relating to the preservation of evidence following inmate assaults, and neglect of duties in matters affecting institutional security like inmate assaults or escapes.")

Finally, evidence from the personnel files regarding truthfulness would be relevant and discoverable and may be admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" on the part of BOP employees. *See* Fed. R. Evid. 404(b).

Employees' performance evaluations are also relevant and discoverable. For example, if an evaluation pertains to an employee's failure to carry out one of his or her duties, this would bear directly on the breach of duty element for the negligence claim.

*Defendants should be compelled to produce these documents.*

Defendants claim that this request is "disproportional" because it lacks a subject matter focus or temporal limit. [Ex.P-2 at #29] However, without knowing what types of information are contained in employees' files, Plaintiff cannot impose a subject-matter focus for this request. The universe of possible subjects covered in documents contained in BOP disciplinary files is currently unknown to Plaintiff. For example, under Program Statement 1210.24 (Ex.P-15), employee misconduct is supposed to be reported to the Office of Internal Affairs. [Ex.P-15 at 3] Types of misconduct fall into three "classifications," with Classification 1 being the most serious. [Ex.P-15 at 4-7] Upon review of the examples of misconduct given for each classification, it appears that a number of them would be relevant to this case. However, Plaintiff does not know whether other types of information are contained in the personnel files. Therefore, any subject matter limit imposed at this point could easily result in the exclusion of relevant and discoverable information. Defendants are, in effect, asking Plaintiff to order from a menu which has not been provided. With respect to the lack of a temporal limit, this request is focused on a discrete number of files of BOP staff members who were employed by the agency at the time of the assault on Mr. Sayles. Plaintiff's request is proportional and in alignment with the scope of Rule 26 and the purpose of discovery.

Defendants' statement that the sustained discipline against some of the individual defendants in this case "do not concern Mr. Sayles or Mr. Wing" again invokes a narrow view of this case which is unsupported by the pleadings. Even if the information does not directly involve Wing or Sayles, it may well involve staff misconduct at USP Canaan which relates to the allegations of longstanding inmate on inmate violence.

This request does not seek highly personal information such as home addresses or family members' names. Rather, it focuses on government employees' performance of their duties. There is a strong public interest in Plaintiff's access to this information. *See King v. Conde*, 121 F.R.D. 180, 195 (E.D. N.Y. 1988) (the public's interest in disclosure of government files "looms largest" in civil rights cases).

Finally, the protective order in place provides ample protection for any documents produced in response to this request. The Protective Order expressly identifies the personnel and disciplinary records of BOP staff

which may contain confidential information as proper subjects of protection and contemplates the production of personnel files subject to the terms of the Protective Order. [*See* ECF. 44 at page 3]

Defendants have not identified any valid reason for withholding this information, which is relevant to the staff misconduct allegations in this case. Plaintiff therefore asks the Court to order the Defendants to produce this information or at the very least provide it to the Court for an *in camera* review.

(Doc. 98, pp. 26-31) (emphasis in original).

In response, Defendants argue that Plaintiff's request is too broad and that the

personnel files are not relevant to Plaintiff's claims. Specifically, Defendants argue:

Plaintiff urges the Court to order the production of all disciplinary information – including unsubstantiated allegations – and all performance evaluations of each individual Defendant. Plaintiff justifies this request as relevant to her theory that "assaults like the one carried out on Mr. Sayles had occurred in the past, due to BOP staff's conduct of putting a violent inmate into another inmate's cell." Motion at 23.

Plaintiff never explains why she need not tailor her request to only sustained discipline that is topically-relevant to that theory. Her failure to do so conflicts with the well-established principle that "the scope of [disciplinary] discovery is determined by comparing the allegations contained in [the] complaint against the nature of the action addressed by the [disciplinary] files, the cause for any prior complaints against the [defendants], and the cause for the discipline in any disciplinary report." *Lee v. Sgt. J. Smith*, 2019 WL 5869747, at *3 (M.D. Pa. Nov. 8, 2019). "For example, disciplinary records concerning absenteeism or tardiness would have no bearing on [Eighth Amendment] claims[.]" *Id.*

Consistently, to the extent courts order the production of disciplinary information in civil rights actions at all, it is only discipline relevant to the particular allegations in the complaint. *See, e.g., Lee*, 2019 WL 5869747 (discussed above); *Thomas v. Lawler*, 2013 WL 1307772, at *3 (M.D. Pa. Mar. 28, 2013) (limiting disciplinary discovery to

"reprimand[s] for violating an inmate's First Amendment religious rights"); *Russell v. Richardson*, 2018 WL 8950574, at *2 (D.V.I. Feb. 16, 2018) (denying all discovery of "disciplinary history, prior complaints received, or other past conduct") (emphasis in original). Even in *Smith v. Donate*, 2012 WL 2061478, *2 (M.D. June 7, 2012), a case cited by Plaintiff, Magistrate Judge Carlson ordered the production only of instances "in which individual Defendants were disciplined for infractions" relevant to the Plaintiff's claims. Additionally, *Smith* did not order did not direct the production of instances of unsustained discipline.

Plaintiff also cites *Scouler v. Craig*, 116 F.R.D. 494 (D.N.J. 1987) as further support for her request for all discipline. But *Scouler* was a § 1983 action against a municipality alleging failure to adequately supervise and train a particular officer. Such sweeping allegations supporting a materially-distinct claim are not analogous to this case. *See Williams v. City of Hartford*, 2016 WL 1732719, at *6 (D. Conn. May 2, 2016) ("The theory for permitting discovery concerning disciplinary history is that it may lead to evidence of pattern, intent and absence of mistake, or support a plaintiff's claim for municipal liability under *Monell v. Dep't. of Soc. Serv.*, 436 U.S. 658 (1978)"). Even still, other cases involving *Monell* claims – which are not at issue here – still endeavor to limit discovery of disciplinary information to that relevant to the claim's allegations. *See, e.g., Williams*, 2016 WL 1732719, at *12 (allegations of abuse of power do not convert defendant's "entire personnel file and disciplinary history into discoverable information").

At most, therefore, the Court should order the Defendants to produce only sustained discipline that is topically-relevant to Plaintiff's theory of BOP staff "putting a violent inmate into another inmate's cell." Motion at 23. Moreover, because Plaintiff argues that this information is useful to prove pattern behavior, it also makes sense to limit the production to incidents of discipline in the relatively recent past, such as in the five years preceding the incident between Sayles and Wing. *See Williams*, 2016 WL 1732719, at *12 (limiting the production to topically relevant discipline over a 27 month period). Discipline that occurred in the distant past would not be probative of practices that Defendants had at the time of the events underlying this case.

(Doc. 110, pp. 20-23) (internal footnotes omitted).

In her Reply Brief, Plaintiff argues:

Plaintiff maintains that disciplinary and performance related information from BOP employees' personnel files is clearly relevant and discoverable. An in camera inspection by the Court of the requested material could alleviate Defendants' concerns.

(Doc. 117, p. 13).

In their Sur-Reply, Defendants argue:

Plaintiff seeks the production of *all* disciplinary information – including unsubstantiated allegations – and *all* performance evaluations of each individual Defendant. She curiously justifies this request as relevant to her theory that "assaults like the one carried out on Mr. Sayles had occurred in the past, *due to BOP staff's conduct of putting a violent inmate into another inmate's cell*." Dkt. No. 98 at 23 (emphasis added). But Plaintiffs' stated need for the information – to determine whether staff had ever been disciplined for "putting a violent inmate into another inmates cell" – is significantly narrower than her request. Even if the Court accepted Plaintiff's articulated "need," which Defendants maintain is illegitimate, *see supra* Part I, the Court, at most, should order Defendants to produce only those portions of the individual defendants' personnel files that pertain to sustained discipline for placing a violent inmate into another's cell. Dkt. No. 98 at 23.

As Defendants argued in their Opposition, "the scope of [disciplinary] discovery is determined by comparing the allegations contained in [the] complaint against the nature of the action addressed by the [disciplinary] files, the cause for any prior complaints against the [defendants], and the cause for the discipline in any disciplinary report." *Lee v. Sgt. J. Smith*, 2019 WL 5869747, at *3 (M.D. Pa. Nov. 8, 2019). "For example, disciplinary records concerning absenteeism or tardiness would have no bearing on [Eighth Amendment] claims[.]" *Id.*

Plaintiff makes no effort to reconcile the breadth of her requests with the holding in Lee, or in any of the other cases cited by Defendants, including others issued by courts in this District. *See Smith v. Donate*, 2012 WL 2061478, *2 (M.D. June 7, 2012) (ordering the production only of instances "in which individual Defendants were disciplined for

infractions" relevant to the plaintiff's claims); *Thomas v. Lawler*, 2013 WL 1307772, at *3 (M.D. Pa. Mar. 28, 2013) (limiting disciplinary discovery to "reprimand[s] for violating an inmate's First Amendment religious rights"); *Russell v. Richardson*, 2018 WL 8950574, at *2 (D.V.I. Feb. 16, 2018) (denying all discovery of "disciplinary history, prior complaints received, or other past conduct") (emphasis in original).

The proper scope of discovery is information relevant to Plaintiff's claims or Defendants' defenses. Fed. R. Civ. P. 26(c). Consistent with that scope, Plaintiff is entitled only to that information related to her claims, which is that one or more individual defendants caused Sayles' injuries by placing a violent inmate in his cell. Accordingly, this Court should deny Plaintiff's motion to compel defendants to produce the entirety of the individual defendants' personnel and disciplinary files.

(Doc. 118, pp. 7-9).

In request for production #29, Plaintiff seeks the production of the entire disciplinary file and performance evaluations of the following eleven Defendants:

(1)   Lieutenant Brian Sudul;

(2)   Correctional Officer Fuller;

(3)   Corr. Counselor Todd Oliver;

(4)   Corr. Counselor James Durkin;

(5)   Lt. L. Gonzalez;

(6)   SIA John Gintz;

(7)   SIS Lt. Wladimir Vizcaino;

(8)   SIS Lt. Anthony Pedone;

(9)   Lt. Richard Hagemeyer;

(10)   C.O. Shawn Vinton; and

(11)   C.O. Cory McCauley.

Defendants contend that this request, which includes no temporal limitations or limitations in scope, is overbroad. They argue that the production of any disciplinary record or performance review should be limited in time to "incidents of discipline in the relatively recent past, such as in the five years preceding the incident between Sayles and Wing," and in scope to "sustained discipline that is topically-relevant to Plaintiff's theory of BOP staff 'putting a violent inmate into another inmate's cell.'"

Plaintiff suggests that *in camera* review may be necessary to resolve this dispute.

I agree with both Plaintiff and Defendants. I find that discovery of the disciplinary records and employee reviews of the above-listed Defendants should be limited to the period from January 1, 2009 to June 1, 2014, with one exception—any employee discipline in the files of these eleven Defendants involving Wing or Sayles should also be produced for *in camera* review (if they have not already been produced to Plaintiff). I will also provide Defendants an opportunity to suggest limitations in scope by submitting proposed redactions to me for *in camera* review. If, after review, I find the redactions appropriate, the redacted copy will be provided to Plaintiff.

## 11.   Request for Production #34 (Email search terms list)

The relevant request and response are reproduced below:

34. Revised search terms list for emails will be sent by December 1st.

**Response**: As of the date of this response, Plaintiff has not issued a revised list of search terms. Also outstanding for resolution between the parties is the proper temporal scope of that search, as well as a list of custodians.

(Doc. 103-2, p. 14).

Plaintiff argues:

Email communications to and/ or from BOP staff (including, but not limited to, supervisory and administrative staff) related to the incident described in the Amended Complaint and the claims asserted in the Amended Complaint.

(Doc. 98, p. 31).

In response, Defendants argue that Plaintiff makes no argument. Specifically,

they contend:

Plaintiff requests the BOP to produce unspecified "emails." The Defendants have always agreed it appropriate that this case involve a search for and production of responsive email communications. The Defendants have offered, for example, to search and produce any emails containing either Wing or Sayles' names, directed to or prepared by any of the individual Defendants, and sent during the two-week periods preceding and following the altercation between Wing and Sayles. Plaintiff seeks something extraordinarily different. Attached here as Exhibit C is the most recently list of search terms proposed by Plaintiff, sent more than a year ago on March 20, 2019 ("Proposed Terms").

The Proposed Terms suggests two separate searches – one limited to the SHU and the other not limited to the SHU. For the SHU-specific

search, Plaintiff requests, for example, all emails with the word
"punch," "protect," "force," "warn," or "separate." The full list consists
of 55 terms, and Plaintiff would have them searched disjunctively, so
that any email containing any of the terms would be responsive.
Plaintiff proposed a two year time span, but proposes no list of
custodians, which would make the search institution wide.

Counsel for Defendants immediately made clear that the request was
overbroad, and ever since Plaintiff has committed to sending a revised
search term list, most recently as part of their list of "Items" included
at Exhibit 1 to the Motion. Item 34 of their latest discovery request (at
Exhibit 1 to the Motion) says that Plaintiff would send a revised list by
December 1, but that list never came. And while Plaintiff has
technically moved to compel on this Item, her brief contains no
argument. Motion at 27. The Defendants are amendable to an
appropriately-limited email search and production, but Plaintiff has
failed for over a year to provide a revised a list or to engage in an
exchange on how to proceed.

(Doc. 110, pp. 23-24).

In her Reply Brief, Plaintiff argues:

After reviewing the parties' efforts to reach an agreement on the
parameters of a search for relevant email communications, today
Plaintiff is sending defense counsel a revised and narrowed search term
list, which will hopefully enable the parties to move forward on this
discovery item.

(Doc. 117, p. 13).

In their Sur-Reply, Defendants argue:

Plaintiff represents in her Reply that "today Plaintiff is sending defense
counsel a revised and narrowed search term list." Dkt. No. 117 at 13.
She never did so. Instead, she sent a letter outlining the substantive
categories of emails she wants but provided no proposed search
protocol for those documents. A copy of her letter is attached as Exhibit
E. As defense counsel explained in response, attached as Exhibit F,
Plaintiff's tactic would shift the burden to Defendants to articulate the
search terms on Plaintiff's behalf. Such proposal not only flies in the

face of all norms of civil discovery (litigants need not author the discovery requests to which they would then respond), but it places the Defendants in the untenable position of having to assure Plaintiff that their search managed to collect all topically-relevant emails. Federal discovery procedure does not permit such an approach, which would also invite Plaintiff to make yet another spoliation allegation down the line.

Regardless, ***Defendants have already proposed search terms***. Indeed, Defendants have long suggested a search for all emails (1) containing either Wing or Sayles' names, (2) directed to or prepared by any of the individual defendants, and (3) sent during the two-week periods preceding and following the altercation between Wing and Sayles. Plaintiff sent her most recent proposal more than a year ago – on March 20, 2019 – which involved two separate searches and included the disjunctive application of 55 nonspecific terms (including punch, protect, force, warn, or separate) over a two-year period without custodial limitations. To demonstrate the absurdity of this request, Plaintiff's search would return and require human review of an email sent by anyone on any day two years before the incident here if it contained the phrase "fruit punch" or "storm warning." The Rules of Civil Procedure do not endorse such a broad request. In fact, they protect against it. See F.R.C.P. 26(b)(2)(B) ("A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible ***because of undue burden or cost***). Accordingly, Defendants promptly objected and proposed a practical alternative.

Courts "expect counsel to 'reach practical agreement' without the court having to micro-manage e-discovery [of] 'search terms, date ranges, key players and the like …. [T]he use of key words has been endorsed as a search method for reducing the need for human review of large volumes of ESI.'" *Romero v. Allstate Ins. Co.*, 271 F.R.D. 96, 109 (E.D. Pa. 2010) (citations omitted) (ordering parties to confer and come to an agreement regarding ESI search terms in response to motion to compel); *Pyle v. Selective Ins. Co. of Am.*, 2016 WL 5661749 (W.D. Pa. Sept. 30, 2016) (compelling propounding party (the plaintiff) to produce a reasonable list of search terms after finding his argument that the responding party (the defendant) should unilaterally develop terms

to capture potentially relevant and responsive documents to be "incomprehensible" and "baseless").

Here, Plaintiff has failed to provide revised search terms in response to Defendants' well-founded objection and has failed to "meet and confer" as required by Local Rule. Instead, she has come to the Court seeking its endorsement of her burden-shifting discovery paradigm, which is well beyond the bounds of federal discovery practice. To the extent this Court orders Defendants to produce emails, which Defendants have agreed to do, it should require Defendants to use the search terms last on the table: the ones they proposed long ago without receiving a counter proposal.

(Doc. 118, pp. 9-12) (internal footnote omitted).

The parties seem to agree that a list of search terms, and some time limits are in order. They do not apparently agree what the universe of emails to be searched should be. However, at the time Plaintiff's Motion to Compel was filed, it appears that the parties were still working together to resolve this issue. Therefore I direct the parties to continue working it out on their own. If the parties reach an impasse on the issue of Email Search terms they are directed to contact my Courtroom Deputy on or before the date specified in Section V of this opinion to schedule a telephone conference.

## B. OTHER OUTSTANDING DISPUTES

After making arguments related to Defendants' responses to the November 26, 2019 discovery requests, Plaintiff identifies four "additional issues in dispute." I have addressed each of these issues below.

### 1. Additional Issue #1 (Joseph Wing's 2014 FBI Interview)

Plaintiff argues:

On January 24, 2020, Defendants produced a document which refers to an interview of Joseph Wing (Plaintiff's attacker) on May 19, 2014, three days after the attack. [Ex.P-18] The document indicates that a recording was made of this interview, although no notes were taken and no report was made. The document further states that the recording is on a compact disc in an attachment labeled "FD-340."

This is the first reference to a recording of an interview of Joseph Wing in the discovery produced by Defendants so far. It is clearly relevant to this case and is encompassed in Plaintiff's discovery requests. [USA RPD # 2] Plaintiff asks the Court to order the Defendants to produce this recording.

(Doc. 98, p. 31).

In their Brief in Opposition, Defendants report that they made additional production since the filing of Plaintiff's Motion, and that no issue remains on Additional Issue 1. (Doc. 110, pp. 24-25).

In her Reply Brief, Plaintiff agrees that the recording of the FBI interview of Joseph Wing was produced in March 2020. (Doc. 117, p. 13 n. 5).

Accordingly, I find that this issue has been resolved by the parties.

### 2. Additional Issue #2 (Custodial Manual)

Plaintiff argues:

A "custodial manual" is referred to in the Lieutenant Position Description as a source of "information as to operations and procedures." [See Ex.P-16 at DEFENDANT002022] This manual falls squarely within many of Plaintiff's original discovery requests served on multiple Defendants on November 22, 2017, yet was never produced

by Defendants, or even mentioned, throughout the extensive discovery proceedings in this case. BOP policies and procedures are at the heart of this case – both for the Bivens claims and the FTCA claims. As with the other manuals, Plaintiff is entitled to discovery of this manual in order to obtain information on how the custody staff at USP Canaan were to perform their duties. Plaintiff asks the Court to order the Defendants to produce this manual.

(Doc. 98, pp. 31-32).

In response, Defendants argue that:

As the Second Kerr Declaration explains, the Custodial Manual requested in "Additional Issue" 2 is the same thing as the Correctional Services Manual. Second Kerr Dec. ¶12a. As described in Section II.B., above, that Manual should not be produced

(Doc. 110, p. 25 n. 9). The Second Kerr Declaration states, in relevant part that:

a.      (2) There is no manual titled "Custodial Manual." The Custodial Manual referenced in Lieutenant Position Description is the Correctional Services Manual requested in **ITEM 26**.

(Doc. 110-2, p. 17).

In her Reply, Plaintiff argues "[i]n addition, Defendants have clarified that the "Custodial Manual" is the same thing as the Correctional Services Manual, the production of which remains in dispute. (Doc. 117, p. 13 n. 5).

This issue will be addressed in Section IV. A. 8 because it is duplicative of Request for Production number 26.

### 3.      Additional Issue #3 (Sayles administrative remedy documents)

Plaintiff argues:

Defendants have produced no administrative remedy documents, including appeals from Mr. Sayles' DHO proceedings. These

documents are encompassed by Plaintiff's discovery requests. Plaintiff asks the Court to order the Defendants to provide the Bates labels for these DHO appeal documents if they were produced, so that they can be located in the production. If these documents were not produced, Plaintiff asks the Court to order the Defendants to produce them and, if they cannot be located, to provide detailed information about the search for them.

(Doc. 98, p. 32).

In their Brief in Opposition, Defendants report that they made additional production since the filing of Plaintiff's Motion, and that no issue remains on Additional Issue 3. (Doc. 110, pp. 24-25). In support of their position, Defendants submitted a declaration, which states in relevant part that:

> b.    (3) Donshay Sayles' DHO appeal (BP-10) re: incident report dated April 23, 2014.
>
> i.    **Supplemental Production.** The Administrative Remedy Generalized Retrieval pertaining to Sayles' refusing to obey an order to leave SHU, Administrative Remedy ID Number 780650-R1, on April 23, 2014, is produced. The DHO appeal was rejected as untimely by the Northeast Regional Office. Thus, there is no corresponding Administrative Remedy File created which (if the remedy were accepted) would contain the actual BP-10 appeal and substantive agency response.

(Doc. 110-2, pp. 17-18).

In her Reply Brief, Plaintiff argues:

> This request seeks Mr. Sayles' appeal from the DHO's guilty finding for the incident reports issued to him for refusing to enter general population. After Plaintiff moved to compel, Defendants produced a computer printout that indicates that this appeal, consisting of four pages, was received by the Northeast Regional Office of the BOP and

rejected as "untimely" on May 20, 2014. [Ex. P-22 at 2, DEFENDANT224077, attached hereto] Plaintiff seeks the actual document submitted by Mr. Sayles, which is critical in this case because it contains his complaints about BOP staff members' treatment of him after he refused to enter the compound. According to Mr. Sayles' letter to Janice Shorter dated May 7, 2014, he sent this appeal to the Northeast Regional Office on or about that same date. In this letter, Mr. Sayles states "I just sent out my appeal on the incident reports I told you I received. I don't know what they going to do about them though. I'm just trying my hand. I know that what they did was all set up by that Lieutenant Dude Sudul. I knew he was going to find a way to mess over me." [Ex. P-23, attached hereto] Plaintiff needs information about when and how this appeal was processed and sent to the NERO, including which staff members were involved. Plaintiff also needs the actual document. Plaintiff proposes that this issue be addressed at the hearing on the motion to compel.

(Doc. 117, pp. 16-17).

In their Sur-Reply, Defendants argue:

Regarding Additional Item 3, see DKt. No. 98 at 28, in which Plaintiff requested Mr. Sayles' DHO appeal for an incident on April 23, 2014, Defendants made a supplemental production from the Administrative Remedy Generalized Retrieval. See Second Declaration of Jonathan Kerr, Dkt. No. 110-2, at ¶ 12b. Mr. Kerr explains that, because "[t]he DHO appeal was rejected as untimely by the Northeast Regional Office . . . there is no corresponding Administrative Remedy File created which (if the remedy were accepted) would contain the actual BP-10 appeal and substantive agency response." *Id.* In her Reply, Plaintiff reasserts that she wants the actual form submitted by Mr. Sayles. However, ***the BOP did not create – and was not required to create – a file with the appeal because it was rejected***. *Id; see also* Third Declaration of Jonathan Kerr, ¶ 6a ("Because the remedy submission was not accepted, the actual documents submitted by Sayles are not retained and there is no government file. Upon rejection, the documents submitted are returned to the inmate") (emphasis in original). Thus, again, Plaintiff seeks the Court to order production of documents that do not exist.

(Doc. 118, pp. 16-17) (emphasis in original).

While the Plaintiff has identified what documents she seeks, and why she wants them, Defendants allege that these documents were not required to be maintained and to the extent that they once existed they would have been returned to Mr. Sayles. If the documents don't exist, they can't be produced. The request for production of Mr. Sayles administrative remedy documents regarding his transfer from the SHU to general population is denied.

### 4.   Additional Issue #4 (Sayles' Request Slips)

Plaintiff argues:

> Defendants have not produced request slips from Mr. Sayles time at Canaan or from his incarceration at any other BOP institution. Request slips are required to be maintained in the inmate's Central File. There is evidence that indicates that Mr. Sayles did submit request slips to staff, as one of the documents produced by Defendants is a response to such a request submitted on April 22, 2014. [Ex.P-19] Plaintiff needs these documents, because they provide information about Mr. Sayles' interactions with BOP employees. Plaintiff initially requested these documents in November 2017. Plaintiff asks the Court to order the Defendants to provide the Bates numbers for these documents if they were produced, so that they can be located in the production. If these request slips have not been produced, Plaintiff asks the Court to order the Defendants to conduct a search for these documents and produce them if they are located and, if they are not located, to provide detailed information about the search.

(Doc. 98, pp. 32-33).

In their Brief in Opposition, Defendants report that they made additional production since the filing of Plaintiff's Motion, and that no issue remains on

Additional Issue 4. (Doc. 110, pp. 24-25). In support of their position, Defendants

submitted a declaration, which states in relevant part that:

c.      (4) Donshay Sayles' request slips:

i.      **Produced.** Request for informal resolution (BP-8's)
        submitted to the counselor occasionally are stored in the
        Central File, despite the fact BOP Program Statement
        5800.17, *Inmate Central File, Privacy Folder, and Parole
        Mini-Files*, states "No Administrative Remedy Responses
        should be maintained in the Inmate Central File." Informal
        resolution forms aren't required to be kept in the central
        file or elsewhere. If they are retained to serve some
        purpose or probative value they are stored in Section 6 of
        the Central File. I reviewed Mr. Sayles' Central File and
        located one inmate request to staff response pertaining to
        recommended Residential Reentry Center Placement,
        which is located at DEFENDANT 001750.

(Doc. 110-2, p. 18).

In her Reply Brief, Plaintiff argues:

Defendants respond that there are no BP-8 forms in the file. However,
BP-8 forms appear to be different than "Inmate Request to Staff Forms"
which are labeled "BP-AO148" in the upper left corner. [See Ex. P-24,
attached hereto]. In light of the possible confusion over the term
"request slips" and given that no informal requests of any type have
been produced for Mr. Sayles' nearly 15 years of incarceration, Plaintiff
asks Defendants to confirm that there are no responsive documents
which fit into this category.

(Doc. 117, pp. 14-15).

In their Sur-Reply, Defendants clarify:

Finally, regarding Additional Item 4, *see* Dkt. No. 98 at 28, Plaintiff
clarifies she wants the "BP-AO148 Forms", rather than the "BP-8
Forms." See Dkt. No. 117 at 14-15. These are the same. As Jonathan
Kerr explains, however, "Staff forms, Requests for Informal

Resolution, Cop-Outs, BP-8's, and BP-148 are synonymous, used interchangeably and when received are processed and stored in the same manner." Third Kerr Decl. ¶ 6b. Thus, there are no additional documents responsive to this request that can be produced.

(Doc. 118, p. 17).

It appears from these exchanges that the parties have resolved this issue and that no additional documents responsive to this request can be produced. Therefore, I find that Additional Issue #4 has been resolved by the parties.

### C. PENDING MOTION FOR SUMMARY JUDGMENT

On February 24, 2020, the same day Plaintiff filed her Motion to Compel, Defendants Durkin, Fuller, Gintz, Gonzalez, Hagemeyer, McCauley, Oliver, Pedone, Sudul, Vinton, and Vizcaino (collectively "Moving Defendants") filed a Motion for Summary Judgment. (Doc. 95). On February 26, 2020, Moving Defendants filed a Brief in Support and Statement of Facts. (Docs. 99, 100). The Motion for Summary Judgment raises only one legal issue—the statute of limitations.

On March 19, 2020, Plaintiff filed a Brief in Opposition (Doc. 108) and Responsive Statement of Facts (Doc. 108-1).

On March 31, 2020, Moving Defendants filed a Reply. (Doc. 111).

On May 8, 2020, I issued a Report & Recommendation that addresses the pending Motion for Summary Judgment. (Doc. 119). Objections to that Report & Recommendation have been filed. (Docs. 120, 121, 122).

On May 8, 2020, United States District Judge Malachy E. Mannion issued an order, in which he noted that a hearing about the Motion to Compel had been scheduled and canceled, and recommitted the case to me to resolve the discovery disputes presented in the Motion to Compel. (Doc. 123). Judge Mannion also instructed me to determine whether the resolution of the discovery disputes has any impact on the pending Motion for Summary Judgment. *Id.*

Having thoroughly reviewed the discovery disputes presented in Plaintiff's Motion to Compel, I advise the Court that these disputes have no impact on the statute of limitations issue raised in the pending Motion for Summary Judgment (Doc. 95). No revisions to that Report are required to accommodate the findings made on this pending Motion to Compel.

## V.    CONCLUSION

Accordingly, Plaintiff's Motion to Compel will be Granted in Part and Denied in Part.

**I find that the following discovery disputes were resolved by the parties while Plaintiff's Motion was pending:**

(a)    Request for Production #1 (Green Monster Logbook) [*See* pp. 15-17]:

(b)    Request for Production #3 (Sayles' Form 292s) [*See* pp. 19-22];

(c)    Request for Production #9 (May 14, 2014 Daily Logs) [*See* pp. 26-28];

(d)     Request for Production #11 (Wing's "Sensitive Report" Information) [*See* pp. 28-30];

(e)     Additional Request #1 (Wing's FBI Interview) [*See* pp. 82-83]; and,

(f)     Additional Request #4 (Sayles' Request Slips) [*See* pp. 87-89].

**The following requests for production are DENIED for the reasons stated in this Opinion:**

(a)     Request for Production #2 (Wing's Form 292s) [*See* pp. 17-19];

(b)     Request for Production #6 (Rounds Check Sheets) and request for spoilation hearing [*See* pp. 22-26];

(c)     Request for Production #20 (Lieutenants' Meetings Course List) [*See* pp. 30-33]; and,

(d)     Additional Request #3 (Sayles' Administrative Remedy Requests) [*See* pp. 84-87].

**The following requests for production are GRANTED as follows:**

(a)     Request for Production #26 and Additional Request #2 (Portions of Three Custodial Manuals). Copies of the requested sections of the manuals should be turned over with appropriate designations under the stipulated confidentiality order. However **IF** Defendants object to the production of **specific passages** from these chapters such that they would need to be redacted despite the protections already in place, they may submit a copy of that chapter to the Court, along with a detailed explanation of their basis for withholding or redaction of **each specific paragraph** at issue for *in camera* review. Two documents, one with and one without redactions, must be sent to my Courtroom Deputy via email to Christine_Williamson@pamd.uscourts.gov on or before **April 15, 2021**. The subject line of that email should be "*Shorter v. Samuels,*

3:16-CV-1973, documents for *in camera* review." [*See* pp. 33-48, 83-84].

**The following requests for discovery require further action by the parties**

**before they can be resolved by the Court:**

(a)   Plaintiff should address Requests for Production #22, 27, 28 (Inmate Violence Reports) individually in a new, separately filed Motion to Compel. This new Motion to Compel (along with the Supporting Brief and any exhibits) is due on or before **April 15, 2021** [*See* pp. 48-70];

(b)   With respect to Request for Production #29 (Defendants' Personnel Files, specifically disciplinary history and performance evaluations), Defendants will either turn over the requested files or submit one full unredacted copy, and one proposed redacted copy, of the disciplinary files and employee performance reviews for the eleven Defendants listed in Section IV.A.10 of this Opinion for the period between January 1, 2009 and June 1, 2014 on or before **April 15, 2021.** These files must include both substantiated and unsubstantiated allegations.

Defendants will submit one full unredacted copy and one proposed redacted copy, of any entry of any disciplinary matter that involves one of the eleven Defendants listed in Section IV.A.10 and either Wing or Sayles on or before **April 15, 2021**. If there are none outside of the time period specified above, then Defendants should indicate there are none.

The unredacted and redacted copies of the disciplinary files and employee performance reviews should be submitted via email to Christine_Williamson@pamd.uscourts.gov. The subject line of that email should be "*Shorter v. Samuels,* 3:16-CV-1973, documents for *in camera* review." [*See* pp. 70-78]; and,

(3)   At the time briefing concluded on this Motion, the parties were still engaging in informal discussions to resolve Request for Production #34 (Email Search Terms). The parties are encouraged to continue those discussions. If the parties reach an impasse on the issue of Email Search terms or the universe to be searched they are directed to contact my Courtroom Deputy on or before **April 15, 2021** to schedule a telephone conference. [*See* pp. 79-82].

An Appropriate order will follow.

Date: March 17, 2021                    BY THE COURT

                                        *s/William I. Arbuckle*
                                        William I. Arbuckle
                                        U.S. Magistrate Judge